# 𝔖𝔱𝔞𝔲𝔫𝔱𝔬𝔫

## W. L. HARRIS, ET AL. v. E. L. DUNHAM, ET AL.

August 31, 1962.

Record No. 5451.

Present, Eggleston, C. J., and Spratley, Buchanan, Snead, l'Anson and Carrico, JJ.

*John S. Davenport, III* and *William R. Cogar* (*Denny, Valentine & Davenport*, on brief), for the appellants.

*Richard L. Williams* (*Richard N. Harris; Battle Neal, Harris, Minor & Williams*, on brief), for appellee, E. L. Dunham.

*Thomas H. Oxenham, Jr.* and *Oxenham, White & Paul*, on brief, for appellee, Raymond Newell.

CARRICO, J., delivered the opinion of the court.

These proceedings were commenced by the filing of a bill of complaint by Howard C. Vick against E. L. Dunham, Kenneth J. Ganaway and W. L. Harris. The bill alleged that Vick held in escrow certificates for 100 shares of the capital stock of Dairy Queen of Virginia, Incorporated, which Ganaway and Harris had previously sold to Dunham, and that a dispute had arisen as to the proper disposition of the stock certificates. The bill prayed that the court determine to whom Vick should make delivery of the certificates.

Ganaway and Harris answered the bill asserting that the stock certificates should be delivered to them, since Dunham had refused to pay the balance of the purchase price therefor.

Dunham filed an answer to the bill and, with leave of court, also filed a cross-bill against Ganaway and Harris.

In his cross-bill, Dunham alleged that he had been induced to buy the stock through the fraudulent misrepresentations of Ganaway

and Harris and, as a result of such misrepresentations, had been damaged in the sum of $75,000.00, for which he asked judgment. Dunham also asserted that the stock certificates should be delivered to him.

Ganaway and Harris filed answers denying the allegations of Dunham's cross-bill. Ganaway also filed a cross-bill against Dunham praying for judgment in the sum of $5,000.00, which was alleged to be due upon two promissory notes given by Dunham to Ganaway as part of the deferred purchase price · for the stock. Dunham answered this cross-bill denying his liability on the notes because of the fraud of Ganaway and Harris involved in the sale of the stock.

Raymond Newell, with leave of court, filed an intervening petition in which he asked for judgment against Dunham in the sum of $5,000.00. Newell alleged that he was the holder in due course of two promissory notes which Dunham had given Harris as part of the deferred purchase price of the stock. Dunham's answer to Newell's petition denied that Newell was the holder in due course of the notes and alleged that Dunham was not liable thereon because of the fraud of Ganaway and Harris in the sale of the stock.

The chancellor heard the evidence *ore tenus* and, in a written opinion, ruled that Dunham was liable for the balance of the purchase price of the stock, as represented by the promissory notes, but held that Ganaway and Harris had fraudulently misrepresented and concealed certain facts in the sale of the stock, for which they were liable to Dunham in damages.

The final decree awarded judgments in favor of Ganaway and Newell against Dunham on the promissory notes executed by the latter; awarded judgment in favor of Dunham, on his cross-bill, against Ganaway and Harris in the sum of $19,110.00; directed that Vick retain the stock certificates until Dunham paid in full the deferred purchase notes therefor, and awarded judgment in favor of Vick against Ganaway and Harris in the sum of $318.75 for attorney's fees and costs as escrow agent.

We granted Ganaway and Harris an appeal from the chancellor's actions in entering judgments against them in favor of Dunham and Vick. The assignments of error present the sole question of whether these rulings were proper, under the law and the evidence.

The evidence discloses that Dairy Queen of Virginia, Incorporated, or the corporation, as it will hereafter be called, was formed in Virginia in 1956, by Ganaway, a resident of Florida, and Harris, a resi-

dent of North Carolina. Each of the organizers obtained 50% of its capital stock, or 50 shares each.

In the same year, the corporation purchased from Thomas R. Gowdey the franchise rights to operate in Virginia, which included the right to use Dairy Queen machines and the right to employ the name "Dairy Queen" in the sale of a frozen dairy mix product, similar to ice cream.

The corporation was substantially indebted to Gowdey for the balance of the purchase price of the franchise rights. The bulk of the assets of the corporation was pledged to secure the debt, and payments on the debt were calculated on the basis of $0.07 for each gallon of the product sold in the state.

After the purchase of the franchise rights, the corporation employed Herbert R. Morrison as state manager. He became the executive vice-president and treasurer and two shares of capital stock were issued to him, making the total outstanding stock 102 shares.

The corporation owned three stores, one in Roanoke, one in Staunton and the other in Franklin, which it leased to individual operators. In addition, there were 28 other stores, located in various parts of the state, which were privately owned and individually operated, with which the corporation conducted business.

The corporation entered into agreements with the operators of the stores. We are not advised of the nature and content of these agreements because they were not introduced into evidence, but from references in the testimony it appears that each operator was granted a sub-license to use Dairy Queen machines and to employ the name "Dairy Queen," in his business and in the sale of the mix product.

Because of the nature of the product being dispensed, the stores operated on a seasonal basis, generally being closed during the winter months.

Each year, the corporation entered into agreements with one or more dairies to supply the operators with the mix product. Under these agreements, the individual operator ordered, from one of the dairies, the quantity of mix he desired. The dairy furnished the mix to the operator but sent the invoice therefor to the corporation, which made payment to the dairy. The operator then paid the corporation $1.27½ per gallon for the mix, which included the dairy's charge of $0.89½ per gallon, the corporation's royalty of $0.35 per gallon and a charge known as "mix profit" of $0.03 per gallon. This "mix profit" charge went into a fund which was used, in part, to

defray the corporation's overhead. Details of the fund were explained to the operators at their annual meeting and they then had the right to elect to receive the remaining balance in cash or to devote it to cooperative advertising.

Herbert Morrison negotiated a contract with the dairies for the furnishing of the mix product to the operators for the year 1958. He secured an arrangement whereby the dairies would refund to the corporation a percentage of the cost of the mix product whenever the volume purchased exceeded a prescribed number of gallons. This refund was known as "volume rebate" and, during the months in 1958 in which it was paid, was retained by the corporation. This arrangement did not increase the cost of the mix product to the operators over what they had paid in previous years.

In the summer of 1958, Wendell Morrison, who operated three stores in Richmond, discovered that the dairy supplying his mix product was paying the "volume rebate" to the corporation. He complained about this payment to Herbert Morrison, stating that he was going to notify the operators and that "he wasn't going to let it pass."

In September, 1958, Herbert Morrison, Ganaway and Harris held a meeting in West Palm Beach, Florida. Morrison advised Ganaway and Harris that the operator of the Danville store had stated that he would not re-open in 1959; that the Roanoke store had been "orally condemned" by the health department because extensive repairs were needed; that other stores were in financial difficulties; that there was unrest among the operators because of the "mix profit" charge being made by the corporation, and that Wendell Morrison had complained about the "volume rebate."

On November 7, 1958, Herbert Morrison wrote Harris and advised him that "Dairy Queen, Mount Vernon Avenue, Alexandria, has closed for good."

On November 15, Wilbur C. Allen, an attorney, wrote to Harris and Ganaway concerning the Gowdey indebtedness owed by the corporation. The letter stated that the gallonage statements furnished by the stores indicated, "that approximately 10 stores are operating at or below the break-even point. In all probability these stores will not open next season."

Prior to the Florida meeting in September, Herbert Morrison and his assistant state manager, Harvey Welborn, offered to purchase the 100 shares of stock in the corporation owned by Ganaway and Harris for a total price of $30,000.00. This offer was rejected

and Ganaway offered to sell his 50 shares to Morrison for $35,000.00 which Morrison rejected.

During the Florida meeting, Harris offered to sell, and the corporation agreed to buy, his stock for $25,000.00. An agreement to this effect was executed and the stock certificate was endorsed by Harris to the corporation. However, this transfer could not be effected because the parties discovered that it was forbidden by Virginia law, since there existed a deficit in the corporation's surplus account.

Harris then offered to purchase Ganaway's stock for $25,000.00 and the latter accepted this offer. Before this transaction could be completed, Morrison resigned his positions with the corporation and Ganaway and Harris concluded that they could not conduct the business without him.

Ganaway and Harris decided to sell their stock and placed an advertisement in the *Wall Street Journal*, which read as follows:

"Dairy Queen basic franchise, middle Atlantic states, showing gross profit $25,000.00 annual volume. $50,000.00 cash. No information given except at personal interview in Florida. . . . ."

Dunham, then a resident of Kankakee, Illinois, read the advertisement, went to Florida, and discussed with Ganaway the possibility of his purchase of the stock. Ganaway explained the manner in which the business was operated and, in response to Dunham's questions, stated that the $25,000.00 gross figure, mentioned in the advertisement, was personal income that could be withdrawn from the business.

The corporate books and records were not in Florida and so Dunham and Ganaway decided to meet later in Richmond so that Dunham could examine them. On December 27, 1958, Dunham came to Richmond and met with Ganaway and Harris. The books and records of the corporation, together with various financial statements and records of operation of the individual stores, were made available to Dunham. He examined them and asked questions concerning them. Edward I. Hardy, an independent certified public accountant who handled the corporation's accounting work, was brought into one of the meetings and instructed by Ganaway to answer any questions which Dunham might want to ask. According to the testimony, Dunham casually questioned Hardy concerning the affairs of the corporation.

One of the records shown to Dunham was the report of Hardy's examination and audit for the 1957 fiscal year ending February 28, 1958. Included in this report was a profit and loss statement. Gan-

away and Harris pointed out four items on the statement, totalling $21,543.99, which they said Dunham would be able to draw from the business as income. They also told him that the "volume rebate," which did not appear on the 1957 statement and which they and Dunham estimated would total $4,500.00 by the end of the fiscal year, could be retained by him as income.

Dunham decided to purchase the stock, and a contract dated December 29, 1958, was prepared and executed embodying the agreement of the parties. Dunham paid $30,000.00 in cash and gave Ganaway four promissory notes, each in the sum of $2,500.00, the first note payable August 15, 1959, and the others payable yearly thereafter, respectively. Similar notes were given to Harris. The stock certificates were endorsed to Dunham and placed in the hands of Vick, as escrow agent, to hold until the promissory notes were paid and then to deliver them to Dunham.

Dunham undertook the operation of the business. He testified that on February 9, 1959, he met Wendell Morrison, the operator of the three Richmond stores, who "unloaded both barrels" on him concerning the corporation's retention of the "mix profit" and "volume rebate." He further stated that Morrison threatened to take legal action to try to recover what he considered to be an overcharge by the corporation.

At the annual meeting of the operators on February 19, 1959, Dunham encountered further dissension concerning the "mix profit" and the "volume rebate." He later conferred with Vick, his attorney, and then informed the operators, by letter, that thereafter the corporation would return the "volume rebate" to them.

At the beginning of the 1959 season six stores did not re-open and remained closed throughout the year. Four of them did not re-open in 1960. One of the stores that did not open in 1959 was the corporation's Roanoke store. Dunham found that it could not re-open until certain repairs were made to the satisfaction of the health department. He expended $1,522.60 in making repairs and re-opened the store in 1960.

The chancellor found that Ganaway and Harris were guilty of misrepresentations and concealments, in the sale of the stock, because:

1. They allowed Dunham to believe he could "count on" the $4,500.00 per year "volume rebate." In the judgment, $9,000.00 was allowed Dunham for the loss of this amount for two years.

2. They failed to communicate to Dunham that six stores would not re-open in 1959. In the judgment, $5,540.00 was awarded for

the loss of expected profits in 1959 from the six stores, calculated on the basis of the number of gallons of mix product sold in the stores in 1958; an additional $3,048.00 was awarded, on the same basis, for the four stores which did not re-open in 1960.

3. They failed to communicate to Dunham the fact that repairs were needed at the corporation's Roanoke store. The cost of these repairs, $1,522.60, was allowed for this item.

4. They failed to communicate to Dunham the unrest and hostility of the operators.

We are of the opinion that the finding of the chancellor, that Ganaway and Harris were liable for fraudulent misrepresentations and concealments, was in error, under the law and the evidence. There is a crucial and controlling reason why the award of damages to Dunham cannot be allowed to stand.

That reason is founded upon the principle of law that one who seeks to hold another in fraud must clearly show that he has relied upon the acts and statements of the other. *Costello* v. *Larsen,* 182 Va. 567, 571, 29 S. E. 2d 856; *Hicks* v. *Wynn,* 137 Va. 186, 193, 119 S. E. 133.

And he must be held not to have so relied when it appears that he has made his own investigation, whether complete or not, into the subject matter at hand. We think this principle applies, in this case, to Dunham and bars his recovery. *DeJarnette* v. *Brooks Lumber Co.,* 199 Va. 18, 29, 30, 97 S. E. 2d 750; *Poe* v. *Voss,* 196 Va. 821, 826, 827, 86 S. E. 2d 47; *Masche* v. *Nichols,* 188 Va. 857, 867, 868, 51 S. E. 2d 144; *West End Co.* v. *Claiborne,* 97 Va. 734, 751, 752, 34 S. E. 900.

It should be emphasized, at this point, that the evidence shows that Dunham was an experienced businessman. A mimeographed statement, prepared by Dunham and presented by him to Ganaway in their first conference in Florida, was introduced into evidence. It sets forth, in full and minute detail, his qualifications as a "merchandising management executive" and his "29 years diversified and increasingly responsible experience," including management, for 9 years, of a department store doing more than $1,500,000.00 annual business. This statement, with other evidence, leaves no doubt as to Dunham's business acumen, his familiarity with accounting procedures, and his knowledge of financial affairs.

Dunham testified that when he met with Ganaway and Harris in Richmond, he was shown the books and records of the corporation; he inspected the accountant's report for the previous year;

he asked questions of the officers of the corporation and of the certified public accountant.

He came to Richmond, in his own words, "with the express purpose of finding out and satisfying myself that the business would pay $25,000.00 a year as they stipulated in the ad, and that if it did, that I would go ahead and buy the business."

We think that Dunham's testimony shows conclusively that he conducted his own independent investigation into the subject matter of his purchase.

Dunham is bound by his testimony. His case can rise no higher than this testimony permits. *Crew* v. *Nelson*, 188 Va. 108, 113, 49 S. E. 2d 326; *Massie* v. *Firmstone*, 134 Va. 450, 462, 114 S. E. 652.

The accounting reports for the fiscal year ending February 28, 1958, which Dunham examined, showed that the total current liabilities of the corporation exceeded the total current assets by a ratio of almost 2 to 1; that the current liabilities had increased over the previous year but the assets had decreased; that there was a deficit of $5,446.35 in the working capital account; that the business operated at a net loss in 1956 and at only a small net profit in 1957; that the book value of each share of the stock he was purchasing had a minus value of $10.96; that 91% of the assets of the corporation were pledged to secure the balance of the Gowdey indebtedness in the amount of $125,000.00. The records for 1958 which were placed before him showed that 20 stores had less volume in that year than they had in 1957; that there was a general decline in the volume of business and that the financial plight of the corporation was worsening at an ever-increasing pace.

What Dunham was shown, and given full opportunity to examine, would have disclosed, even to one not as experienced as he, that the business was in a precarious condition, that the value of its stock was questionable, and that its probability of profitable operation was in serious doubt.

It may be true that Dunham did not conduct a complete investigation; that, although he examined the corporate books, records and reports, he did not explore the situation presented thereby and talk to the operators and make an inspection of the stores. He is, nonetheless, by virtue of the fact that he investigated partially, bound by all that a complete investigation would have disclosed.

The language in *DeJarnette* v. *Brooks Lumber Co., supra,* 199 Va., at p. 30, by the mere substitution of Dunham's name in place of the purchaser in that case, is applicable and controlling here:

"[Dunham] either undertook and made a full and independent investigation and inquiry and acted upon the information so obtained, or made a partial inquiry, with full opportunity of complete investigation and ascertainment of all the facts, and then elected, not to exhaust the readily available sources of information, but to act upon the knowledge obtained from his partial inquiry. In *Masche* v. *Nichols*, 188 Va. 857, 868, 51 S. E. 2d 144, 148, it was said:

" 'In either of the latter instances, if he in fact acts upon the information so secured by himself, he will not be heard to say that he relied upon the previous misrepresentation of fact.' "

The evidence before us shows conclusively that Dunham had a full opportunity to investigate completely, with readily available sources of information. Had he taken advantage of his opportunity and elected to exhaust the available information, he could easily have discovered those things which he now says were misrepresented to and concealed from him.

Dunham, had he investigated fully, would have found out that there was dissension among the operators over the "volume rebate." This information would have been disclosed to him by visits or telephone calls to the operators, especially to Wendell Morrison, the operator of the three Richmond stores, and the most vociferous objector among the operators.

In connection with the "volume rebate," it should be pointed out that Dunham, in his cross-bill, alleged that the terms of "some of the licensing agreements" between the corporation and the operators had been violated by Ganaway and Harris, and that such violation caused the unrest and dissension among the operators. It was apparently Dunham's position that this violation consisted of the retention of the "volume rebate" by the corporation.

Dunham's counsel, in argument before us, stated that we should look to the provisions of the "franchise agreement" to find the limitation on the amount the corporation could retain as royalty.

However, as has been previously noted, the agreements between the corporation and the operators were not introduced into evidence, nor was the so-called "franchise agreement." We have searched the record, in vain, for some evidence, oral or written, that would sustain the allegation of the cross-bill that the agreements were violated, or support the conclusion that the corporation was not entitled to retain the "volume rebate." We have found nothing that casts the shadow of falsity on the statement of Ganaway and Harris that Dunham could "count on" these funds.

Our search being fruitless, we must conclude that there was no misrepresentation in this respect, and that the dissension of the operators was unfounded and unwarranted. The return by Dunham to the operators of the "volume rebate" was, therefore, his own voluntary act, which affords an additional, forceful reason for not holding Ganaway and Harris accountable for this item of damage.

■ Dunham, had he made a complete investigation, would have discovered that some of the store operators did not intend to re-open their businesses in 1959. No representation was made to him that all, or any, of the stores would re-open. Since he knew that the stores closed during the winter months, according to custom and as shown by the records he examined, he had no right to assume that they would all re-open. An inquiry by him to each operator would have revealed the true situation.

Moreover, it should be noted that Dunham was awarded $2,068.56 for two years loss of profit because Ganaway and Harris failed to "communicate to him" that the store at Norfolk and the Virginia Beach "number 3" store would not re-open in 1959.

There is no evidence in the record before us, however, that Ganaway or Harris, or even the operators of these two stores, knew, at the time of the sale, that they would not re-open in 1959. That they failed to open in 1959 was not, therefore, a fact in existence at the time of the sale. That which does not exist cannot form the basis of concealment of a material fact. This provides further, compelling reason for the disallowance of damages for the closing of these two stores. *Max Meadows, &c., Co.* v. *Brady*, 92 Va. 71, 83, 22 S. E. 845.

■ A full investigation by Dunham would have disclosed that the Roanoke store could not re-open in 1959 without the repairs required by the health department. The very nature of the repairs Dunham made was such that the need therefor would have been apparent upon casual inspection.

Furthermore, as an experienced businessman, Dunham was bound to know, as the average citizen knows, that a prime requisite for the operation of a food dispensing establishment is the procurement of a permit from the health department. A simple inquiry to that department would have informed him that a permit did not exist for the Roanoke store.

The real gist of Dunham's complaint, as shown by his cross-bill, was that it was misrepresented to him that the corporation "was in good condition and would bring in a net profit of $25,000.00 per

year." However, the books, records and reports which Dunham inspected showed that the corporation was not "in good condition" and would not bring in the prescribed net profit.

In fact, the chancellor found, and Dunham has not challenged this finding, that Dunham was not misled by the figures which were shown to him as the basis for the $25,000.00 annual amount. Dunham, contrary to the allegations of his cross-bill, conceded in his testimony that nothing in the books, records and reports was false, that no information that was given him subsequently proved to be untrue and, although afforded several opportunities, could not point out where the books of the corporation did not reflect its true condition.

Instead of attempting to find out what was readily capable of ascertainment, Dunham chose to rely upon his partial inspection. In doing so, he elected to ignore what was obviously a serious financial condition in the corporation's affairs, and to make his purchase of the stock notwithstanding.

The words of Chancellor Kent amply fit Dunham's situation:

"The common law affords to everyone reasonable protection against fraud in dealing, but does not go to the romantic length of giving indemnity against the consequences of indolence and folly, or a careless indifference to the ordinary and accessible means of information." (2 Kent. Comm. 485, quoted in *Lake* v. *Tyree*, 90 Va. 719, 724, 19 S. E. 787.)

The decree, insofar as it awarded judgments against Ganaway and Harris in favor of Dunham and Vick, is reversed and final judgments are entered in favor of Ganaway and Harris. Final judgment is awarded Vick against Dunham for $318.75, for his fee and costs as escrow agent, and the decree to that extent is modified. In all other respects the decree is affirmed.

*Reversed in part, modified in part and,*
*except as reversed and modified, affirmed.*