INSURANCE COMPANY of NORTH AMERICA, INC., Plaintiff,

v.

UNITED STATES GYPSUM CO., INC., Defendant.

UNITED STATES GYPSUM COMPANY, INC., Plaintiff,

v.

INSURANCE COMPANY of NORTH AMERICA, INC., Defendant.

Civ. A. Nos. 85–0075–A, 85–0149–A.

United States District Court,
W.D. Virginia,
Abingdon Division.

July 17, 1986.

---

Jackson S. White, Jr., Abingdon, Va., Stephen C. Neal, Christopher Mc Elroy, Chicago, Ill., for U.S. Gypsum Co., Inc.

William W. Eskridge, Abingdon, Va., Samuel P. Gerace, Richard B. Sandow, Pittsburgh, Pa., for Insurance Co. of North America.

## MEMORANDUM OPINION

GLEN M. WILLIAMS, District Judge.

This case involves a dispute over whether losses sustained by United States Gypsum Company (USG) at its Plasterco, Virginia facility in November 1984 are covered by an insurance policy issued by Insurance Company of North America (INA) in June 1983. INA contends that the losses are not covered because the insurance policy was procured through fraud and misrepresentation. USG contends that there was no fraud or misrepresentation and that the losses are covered.

Jurisdiction of this court is based on diversity under 28 U.S.C. § 1332. USG has submitted the case for decision on the fraud and misrepresentation issue by motion for partial summary judgment pursuant to Fed.R.Civ.P. 56.

### I.

The facts of this case are both complex and voluminous. For purposes of this opinion, the court has simplified the facts relevant to USG's motion for partial summary judgment. Those facts are as follows.

In the fall of 1982 and early months of 1983, USG sought to revise its property insurance coverage. USG designated the insurance brokerage firm of Emmett and Chandler as its agent for purposes of dealing with various insurance companies in obtaining revised coverage. Apparently, efforts to obtain coverage were quickly focused on INA.

In early 1983, INA was provided certain written information for purposes of determining risks. Included in this information was a five year loss history record for USG facilities and a description of locations known as a traffic manual.

In March of 1983, USG replaced Emmett and Chandler with the brokerage firm of Johnson & Higgins.

In April 1983, USG provided its "fire files" to INA. These files contained plant diagrams, inspection reports and recommendations prepared by USG's previous in-

surer, Factory Mutual.[1] There were also extensive meetings between INA and Johnson & Higgins.

It was also agreed that INA was to be permitted to inspect the various USG facilities. The inspections were to be performed by Industrial Risk Insurers (IRI), a company with a subsidiary relationship to INA and which also participated in backing the insurance policy.[2] Inspection sites were chosen by INA on the basis of a random cross-sampling. Twenty one USG facilities were inspected in the Spring of 1983. Subsequently, on June 1, 1983, the insurance policy in question in this case was issued. This policy provided for coverage at approximately 125 USG facilities throughout North America.

IRI continued its inspections after issuance of the policy. Included in these post issuance inspections were the facilities at Plasterco, Virginia; Fort Dodge, Iowa; and Gypsum, Ohio.

On November 4, 1984, an enormous subsidence event occurred at the Plasterco, Virginia plant. Damages from the subsidence were allegedly in the millions of dollars. On February 1, 1985, INA wrote a letter to USG denying insurance coverage of the damages contending that the loss was the result of a continuing problem with subsidence which started before inception of the insurance contract and that INA was not made aware of this earlier problem. Based on this contention, INA accused USG of fraud and misrepresentation and stated that INA was rescinding the contract of insurance from its inception.

Following this letter, certain events occurred which prompted INA to contend that USG had agreed to a rescission of the insurance contract. INA has earlier submitted the rescission issue to this court on a motion for summary judgment. That motion was denied by an Order of this court dated May 29, 1986.

The court is now asked to decide the issue of fraud and misrepresentation on a motion for partial summary judgment.

## II.

■ Before addressing the merits of this case, the court must first decide what law will apply. This case really presents two different types of cases. First, USG is suing to enforce performance of the insurance policy issued by INA. This is obviously a contract issue related to performance of the insurance contract. A federal court, in a diversity action, must apply the conflicts of laws rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Virginia law adheres to the principle that the law of the place of performance governs questions arising in connection with performance of the contract. *Equitable Trust Co. v. Bratwursthaus Management Corp.*, 514 F.2d 565, 567 (4th Cir.1975). In the case at bar, USG sues to enforce performance regarding damages occurring in Virginia. In other words, USG puts in issue performance of the insurance contract in Virginia. Accordingly, on this issue, this court will apply Virginia law.

■ The second type of case presented by this case is a tort action. INA alleges that USG committed the well recognized torts of fraud and misrepresentation. Virginia law has consistently recognized that it is the place of the wrong (lex loci delicti) that determines which state's substantive law applies in a tort action brought in Virginia. *Baise v. Warren*, 158 Va. 505, 164 S.E. 655 (1932) and *McMillan v. McMillan*, 219 Va. 1127, 253 S.E.2d 662 (1979). The place of the wrong for purposes of the lex loci delicti rule is the place where "the last event necessary to make an act [sic] liable for an alleged tort takes place." *Quillen v. International Playtex, Inc.*, 789 F.2d 1041, 1044 (4th Cir.1986) (quoting *Mil-*

---

1. INA obtained various other written materials including USG's 1982 10–K Registration Statement and its 1982 Annual Report.

2. INA was the lead company among a group of several insurance companies which backed the USG insurance policy.

*ler v. Holiday Inns, Inc.,* 436 F.Supp. 460, 462 (E.D.Va.1977)). In the case at bar, the last event necessary to make USG liable for fraud and misrepresentation occurred in Virginia. Thus, Virginia law will govern the fraud and misrepresentation issues.

### III.

Any decision on the issue of fraud and misrepresentation depends in large part on the quality of information available to INA when it assessed the risk involved in providing insurance coverage for the USG facilities. The parties hotly contest what information was disclosed in the various written materials obtained by INA and the various meetings held prior to issuance of the policy on June 1, 1983. In the rare instances in which the parties do not contest what was disclosed, they contest what the disclosures meant or should have meant to INA in evaluating risks at the USG facilities. Further, these facts are not disputed by mere idle assertions of the parties. Each party meticulously supports its version of the facts with numerous references to deposition testimony and exhibits. The parties have fairly put the facts in genuine dispute.[3] *See Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985). Accordingly, if USG's motion were to be decided on the basis of these written materials and meetings, this court would quickly conclude that USG's motion for partial summary judgment should be denied.

However, there are relevant facts in addition to the written materials and meetings which must be considered. INA, through IRI, conducted inspections before and after the issuance of the policy on June 1, 1983. USG argues, *inter alia,* that when the limited undisputed facts pertaining to these inspections are considered, the labyrinth of disputed facts do not matter.

In other words, the only material facts are those related to the inspection program.

INA, on the other hand, contends, *inter alia,* that because inspections took place after issuance of the policy, the inspections are irrelevant to the fraud and misrepresentation issue. Stated another way, INA argues that once it was induced to enter into the policy, the inspections came too late in time to make any difference. This contention is simply not supported by the record. It is undisputed that approximately 21 USG facilities were inspected before the policy was issued. INA was permitted to choose which facilities were to be inspected. INA was also permitted to determine when the facilities were inspected. Certainly, INA cannot now divert attention from the inspection program because it chose to conduct certain inspections after issuance of the policy. Furthermore, even if the post-issuance inspections revealed an increased risk, INA would have been free to negotiate a change in the policy to compensate for this increased risk. (Lau dep. TR at 62–65 and Yantis dep. TR at 153). INA was not automatically locked in for the term of the policy by virtue of the policy issuing, nor did USG restrict pre-issuance inspections to certain facilities. The inspection program is relevant to the issue at bar.

The court will now consider whether USG is entitled to partial summary judgment on the basis of certain undisputed facts related to the inspection program.

USG's contention that summary judgment is proper is based principally on a line of Virginia Supreme Court cases.[4] The proposition set forth by these cases is as follows:

[O]ne who seeks to hold another in fraud must clearly show that he has relied upon the acts and statements of the other. And he must be held not to have so relied when it appears that he has made

---

**3.** While it may be possible to identify certain facts which are undisputed, it would be ridiculous to suggest that the facts are not largely in dispute.

**4.** USG cites *Masche v. Nichols,* 188 Va. 857, 51 S.E.2d 144 (1949); *Harris v. Dunham,* 203 Va. 760, 127 S.E.2d 65 (1962); and *Piedmont Trust Bank v. The Aetna,* 210 Va. 396, 171 S.E.2d 264 (1969).

his own investigation, whether complete or not, into the subject matter at hand. *Harris v. Dunham*, 203 Va. 760, 767, 127 S.E.2d 65 (1962) (citations omitted).

INA argues that even if the inspection program is taken into account, summary judgment is improper. In support of this contention, INA points to the case of *Home Insurance Co. v. Berry*, 175 Va. 447, 9 S.E.2d 290 (1940). In that case, insurance coverage under a fire policy was denied to a homeowner who failed to disclose to the insurance company that his mortgage was in default and that foreclosure was being considered. This nondisclosure was in contravention of language in the written policy. In holding that the homeowner was not entitled to coverage, the Virginia Supreme Court concluded that one who seeks insurance:

> should state everything which might influence, and probably would influence the mind of the underwriter in forming or declining the contract.

175 Va. at 451, 9 S.E.2d 290 (citation omitted).

Obviously, the proposition set forth by *Home Insurance Co.*, cannot, in every case, be applied consistently with the principle established by the *Harris v. Dunham* line of cases. USG offers the fact there was no independent investigation by the insurance company in *Home Insurance Co.* as the controlling distinction between the two principles. The court agrees that this is a valid distinction. Certainly, an insurance company cannot be held to have relied on its own investigation if none was conducted.

However, USG's distinction invites a detailed examination of the rule promulgated by *Harris v. Dunham*. Taken to its extreme, *Harris v. Dunham* could be said to mandate that any time someone makes any kind of investigation on their own behalf, that person can never hold anyone liable for fraud or misrepresentation regardless of what other facts occurred. This court does not believe the Virginia Supreme Court had such a broad rule in mind when *Harris v. Dunham* was decided. In fact, a close reading of *Harris v. Dunham* clearly indicates that no such result was intended.

*Harris v. Dunham* involved a situation in which the stockholders of a corporation sought to sell their stock. The stockholders met with Dunham for purposes of negotiating a sale of the stock. During these negotiations, the corporation's books and records were made available to Dunham. Eventually, Dunham purchased the stock. After operating the corporation for a period of time, Dunham realized his profits were going to be less than expected. Dunham sued the previous stockholders for damages resulting from alleged misrepresentations. The trial court found the previous stockholders to be liable for misrepresentation as a result of failing to communicate various facts to Dunham. 203 Va. 766–67, 127 S.E.2d 65. The Supreme Court overruled the trial court saying that all of the nondisclosures related to information which was discoverable in Dunham's investigation. The court went on to explain that no untrue representations were made to Dunham by the previous stockholders. 203 Va. 769–71, 127 S.E.2d 65.

■ In view of the above, after careful consideration, this court interprets *Harris v. Dunham* in a more restrictive manner than what is urged by USG. This court is of the opinion that *Harris v. Dunham* sets forth the following rule. If one conducts an investigation, he cannot hold another in fraud unless material untrue affirmative representations were made. Mere nondisclosures would not be sufficient for fraud if an investigation is conducted.

This interpretation of *Harris v. Dunham* is consistent with statutory authority in Virginia. Va.Code § 38.1–336 provides that no statement in an application for an insurance policy will bar recovery unless the statement was material and untrue. It is significant to note that under this provision, the statement need not be wilfully false or fraudulently made. *Chitwood v. Prudential Ins. Co. of America*, 206 Va. 314, 143 S.E.2d 915 (1965).

In deciding whether partial summary judgment should be granted, the court need not make an exhaustive evaluation of all facts related to the investigation program conducted by INA.[5] The court need look no further than certain events attendant the inspection at Plasterco, Virginia.

■ The Plasterco facility was inspected during September 1983 by Mr. Harold Byars of IRI. Mr. Byars was guided during this inspection by Mr. Robert Caywood of USG. As the inspection was being conducted, the location of abandoned mines at Plasterco became a topic of interest. The events that occurred during the discussion of the location of the mines are unclear from the record. Mr. Byars has testified that Mr. Caywood told him the mines at Plasterco were located somewhere south of the buildings at the Plasterco facility.[6] (Byars dep. TR at 60). In actuality, areas beneath the buildings at Plasterco were mined. USG disputes Byars' recollection of Caywood's indication of where the mine was located and contends that Byars was indifferent about the location of the mine during the inspection.[7] Accordingly, the court finds that the facts surrounding the Plasterco inspection are in genuine dispute.

■ Of course, assuming arguendo, that there were false statements made during the inspections, summary judgment would still be available if the statements were immaterial. The parties have not fully developed the issue of whether the possible misrepresentation during the Plasterco inspection was material to a large multi-national commercial insurance policy.[8] Without further development on this issue, the court cannot say as a matter of law that such a misrepresentation would be immaterial.[9] Under *Harris v. Dunham*, if there was in fact a material and false representation, a claim of fraud and misrepresentation would not as a matter of law be precluded by virtue of INA's inspection program.

For the reasons discussed above, the court will this day enter an Order denying USG's motion for partial summary judgment.

The Clerk is directed to send certified copies of this Memorandum Opinion to counsel of record.

---

5. INA makes allegations of fraud regarding inspections at various USG facilities including the inspections at Fort Dodge, Iowa and Gypsum, Ohio. The court makes no determination as to the validity of these allegations.

6. Byars' inspection report indicated that there were no underground excavations beneath the plant.

7. USG also points out that the subsidence did occur south of the buildings at Plasterco. However, if the issue is one of risk evaluation in deciding whether to issue or maintain an insurance policy, the location of the ultimate cave-in would be irrelevant.

8. Certainly, a mine located beneath buildings would pose a greater risk of property damage than a mine located away from buildings.

9. USG argues that regardless of where Mr. Caywood may have pointed to indicate the location of the mine, the incident is immaterial because of other information available to Byars. Byars' own diagram of the Plasterco plant reveals a mine pump and hoist house at the plant. However, these features do not directly reveal the precise location of the underground mine. For this court to speculate as to what these features would mean to an insurance inspector vis a vis the precise location of the mine would amount to the court drawing impermissible inferences from the facts on a motion for summary judgment. *Cooper, Adm. v. Ingersoll Rand Co.*, 628 F.Supp. 1488, 1491 (W.D.Va.1986). This is particularly true when Byars has testified that he did not know the precise location of the mine.

It should be noted that INA will ultimately have the burden of proof to show that any misrepresentations were material. *Hawkeye-Security Ins. Co. v. Government Employees Ins. Co.*, 207 Va. 944, 947, 154 S.E.2d 173 (1967).