## CIRCUIT COURT OF THE CITY OF ROANOKE

Lynchburg Communication
Systems, Inc., et al.

v.

Ohio State Cellular
Phone Co., Inc., et al.

April 26, 2005

Case No. CL02-624

BY JUDGE CHARLES N. DORSEY

The only remaining issue in this matter is whether to confirm the Court's prior decision to set aside the jury verdict on compensatory and punitive damages as contrary to the law and evidence. Following that ruling, counsel was permitted leave to file additional memos and transcripts of the trial, if so desired, and those have been received.

*Verdict Contrary to the Law and Evidence*

In brief summary, this case centers on mediation between Lynchburg Communications Systems, Inc., *et al.* ("LCS") and Ohio State Cellular Phone Co., Inc., *et al.* ("OSC") that took place on February 19, 2002, in the U.S. District Court for the Western District of Virginia. Tr. I, p. 144. Charles Hirtz, the principal of LCS, believed that both parties had entered into an agreement whereby LCS would receive 90% of the proceeds of a non-terminable new lease between OSC and American Electric Power ("AEP"). Tr. I, pp. 144-48. In fact, there was no such lease. There had been an existent master, or tower-space, lease between Appalachian Power Company (the predecessor in interest of AEP) and OSC. The memorandum of settlement was signed later that evening. Tr. I, p. 154. The following day, Mr. Hirtz learned, from Dan Powell

of AEP, that there was no active lease between OSC and AEP inasmuch as it had been terminated.[1] Based on these facts, LCS alleges that OSC committed actual fraud during the court-ordered mediation. After a three-day jury trial, the jury returned a verdict in favor of LCS in the amount of $77,309.53 in compensatory damages and $100,000.00 in punitive damages.

The present issue is whether LCS presented sufficient evidence at trial to prove the claim of actual fraud and to sustain the jury's compensatory and punitive damages award. Given the numerous facts adduced at trial, including all specific facts referred to, as well as other testimony that bears on this issue, the jury verdict will not be reinstated.

As was bluntly stated in *Lane v. Scott*, "if there is a conflict in the testimony on a material point, or if reasonable men may differ in their conclusions of fact to be drawn from the evidence, or if the conclusion is dependent on the weight given to the testimony, the trial judge cannot substitute his conclusion for that of the jury merely because he would have voted for a different verdict if he had been on the jury." *Id.*, 220 Va. 578, 580, 260 S.E.2d 238, 240 (1979). Though my conclusion differs from that of the jury, setting aside the verdict is not substituting my judgment for the jury's, but rather it ensures that the outcome of this case is based on sufficient evidence.

## I. Punitive Damages Award

Generally, punitive damages are "allowable only where there is a misconduct or actual malice, or such recklessness or negligence as to evince a conscious disregard of the rights of others." *Giant of Va., Inc. v. Pigg*, 207 Va. 679, 685, 152 S.E.2d 271, 277 (1967). However, the Supreme Court of Virginia has made clear that in a claim based on fraud, punitive damages may only be recovered if there is "proof, either direct or circumstantial, showing actual malice." *Jordan v. Sauve*, 219 Va. 448, 453, 247 S.E.2d 739, 741

---

[1] Tr. I, p. 155. The lease was "terminated" by correspondence of October 2000 but misfiled by OSC, and Appalachian Power Co. (Apco) continued to make payments on the lease. (Tr. II, pp. 184, 217-28.) This created confusion on the part of both parties to the lease regarding whether the lease was in existence. To clarify the lease status, AEP "reterminated" the same lease by correspondence of February 25, 2002, after the mediation session brought the confusion to light. (Tr. II, pp. 187-88.) The sum of $13,456.80, paid to Mr. Hirtz by AEP, represented 90% of the lease payments received over the life of the lease.

(1978). An award of punitive damages "is not so much to compensate the plaintiff but to punish the wrongdoer. and to warn others." *Hamilton Development Co. v. Broad Rock Club*, 248 Va. 40, 45, 445 S.E.2d 140, 143 (1994).

Hence, in this case, a showing of actual malice is essential since the action is for fraud. Malice occurs when actions are "prompted by ill will, malevolence, grudge, spite, wicked intention, or a conscious disregard of the rights of another." *Peacock Buick, Inc. v. Durkin*, 221 Va. 1133, 1137, 277 S.E.2d 225, 227 (1981) (quoting *Lee v. Southland Corp.*, 219 Va. 23, 27, 244 S.E.2d 756, 759 (1978)). The record demonstrates that the mediation was marked with confusion on LCS's part, but there is no evidence to suggest that OSC was motivated by, or acted in, any willful, conscious disregard of the rights of others so as to rise to the level of malice necessary to sustain a punitive damages award. There is no evidence that OSC misrepresented the lease as non-terminable or had knowledge that the AEP lease had already been terminated, let alone acted with actual malice. Because LCS has not presented sufficient evidence to demonstrate actual malice on the part of OSC, the punitive damages award will not be reinstated.

## *II. Actual Fraud*

LCS alleges that OSC intentionally and knowingly misrepresented or deliberately omitted material facts regarding the OSC and AEP sublease, which became part of a settlement agreement, reached after mediation between LCS and OSC. LCS correctly states the elements of actual fraud, to be proved by clear and convincing evidence, as: (1) a false misrepresentation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party misled, and (6) resulting damage to the party misled. *Evaluation Research Corp. v. Alequin*, 247 Va. 143, 148, 439 S.E.2d 387, 390 (1994).

## *A. Reliance*

Reliance is a key element in actual fraud cases because it is a "principal of law that one who seeks to hold another in fraud must clearly show that he has relied upon the facts and statements of the other." *Harris v. Dunham*, 203 Va. 760, 767, 127 S.E.2d 65, 70 (1962) (citing *Costello v. Larsen*, 182 Va. 567, 571, 29 S.E.2d 856, 858 (1944)). LCS posits that the jury could find that Mr. Hirtz and LCS relied on the statements of Mr. Gartley, an OSC representative. LCS maintains that, during the mediation, Mr. Hirtz relied on

Mr. Gartley's representations, and "but for Gartley's misrepresentations, LCS would not have entered into a settlement agreement had LCS been aware of the true facts." Plaintiff's Post-Trial Brief at 12 (Sept. 3, 2004). In fact, Mr. Hirtz testified that, if someone had told him that the operative lease was the June 8, 2000, tower space license agreement, he would "probably have stopped the mediation . . . [because he] knew that one had termination language in it." Tr. I, p. 149. Mr. Hirtz wanted a guaranteed revenue stream that could not be terminated before the lease expired.

An examination of the record reveals that Mr. Hirtz relied on his own assumptions rather than Mr. Gartley's representations. Mr. Hirtz assumed that he was dealing with a new lease and not the June 8, 2000, tower space agreement, but this assumption was the result of his own beliefs, and not OSC representations. Tr. I, p. 241. Mr. Hirtz testified that, during the mediation when he found out that a lease existed between OSC and AEP, he was "surprised and quite angry" because he thought no lease existed between the two. Tr. I, pp. 146-47, 223-27.

Instead of voicing his concerns during the mediation, Mr. Hirtz believed that the lease they were discussing had to be a new lease because there was no AEP-OSC lease. Tr. I, pp. 226-27. Indeed, Mr. Hirtz believed LCS was entering into a new lease because the June 8, 2000, agreement was with Apco, and Judge Conrad "said they [OSC] had a lease with AEP." Tr. I, p. 228. (As successor in interest to Apco, AEP is often used synonymously, though Mr. Hirtz seemed to strictly distinguish between the two.) Mr. Hirtz further assumed he was entering into a new lease because the master lease required fifteen days notification if OSC initiated a lease, and Mr. Hirtz believed he had received no such notification. Tr. I, p. 147. On cross-examination, Mr. Hirtz admitted that his belief that a new lease was being discussed was based on his assumptions because he did not "believe a phrase 'new lease' came up." Tr. I, p. 241. Despite his confusion, Mr. Hirtz signed the settlement agreement, which stated that LCS would receive a sum "representing 90 percent of the rental proceeds, or $630 per month, whichever is greater, received from American Electric Power during the pendency of its sublease for tower space at No Business Mountain, retroactive to the inception of the sublease." Tr. I, pp. 234-35. (Mr. Hirtz received payment under this provision, but as previously noted, the lease was terminated.)

The law, however, provides little protection for one who elects to ignore a serious misunderstanding. Generally speaking, the common law affords reasonable protection against fraud in dealing, but "does not go to the romantic length of giving indemnity against the consequences of indolence and folly, or a careless indifference to the ordinary and accessible means of

information." *Costello*, 182 Va. at 571, 29 S.E.2d at 858. Similarly, if a party, instead of resorting to facts and equally available knowledge, sees fit to trust himself in the hands of an adversary, the "law will leave him where he has been placed by his own imprudent confidence." *Id.* at 571-72, 29 S.E.2d at 858. During the mediation, Mr. Hirtz was confused about the lease, and instead of voicing his concerns, he chose to believe that OSC must be discussing a new lease, and thus signed the agreement. Accordingly, Mr. Hirtz relied on his assumptions of what the operative lease was, rather than on OSC representations.

## B. Damages

Next, LCS maintains that the damages element of actual fraud is satisfied. Without citing the record, LCS maintains that it is "undisputed that the expert opinion testimony of CPA Joseph Thornton established actual damages to the plaintiffs in an amount nearly equal the compensatory damages awarded by the jury." Plaintiff's Post-Trial Brief at 12 (Sept. 3, 2004).

Mr. Thornton was asked to provide the present value of the lease and to determine the value of the ten-year lease between LCS and OSC. Tr. II, p. 36. Mr. Thornton assumed that the lease had no termination clause and started with payments of 90% of $700, which would equal $630, over a period of ten years with a 4% escalation clause. Tr. II, pp. 36-37. The income stream was valued from March 1, 2002, to July 1, 2004. Tr. II, p. 37. Mr. Thornton arrived at an amount of $79,024.04 by computing the present value of the income stream including the past and future components. Tr. II, p. 40. This amount was fairly commensurable with the jury's compensatory award of $77,309.53.

However, on cross-examination, Mr. Thornton admitted that his calculation depended on the facts presented to him. His calculation was based on the assumption of a non-terminable lease with no payments having been made. Tr. II, pp. 50, 53. Mr. Thornton testified that his valuation would be different if the lease contained a termination clause. Tr. II, p. 50. The lease in question clearly contained a termination clause and was, in fact, terminated.

His calculation was also affected by money paid on the lease. OSC contends that LCS was paid $728 on February 21, 2002. Tr. I, p. 247. Additionally, OSC maintains that LCS received $13,456.80. Tr. 1, p. 248. Mr. Hirtz stated that, although he did not cash that check, he received the benefit. Tr. I, p. 249. Later, he testified that he believed that the $13,456.80 check was a "manufactured document after the fact, because [he had] not seen [any]

checks from anybody in discovery that represents any of these amounts." Tr. I, p. 251.

Accordingly, due to the lease being terminable and the fact that payments were received, LCS's damages calculation was dependent on guesswork and speculation, which is not permitted. *Hale v. Fawcett*, 214 Va. 583, 585, 202 S.E.2d 923, 925 (1974) (quoting *Barnes v. Quarries, Inc.*, 204 Va. 414, 418, 132 S.E.2d 395, 397-98 (1963)).

Although the jury is permitted to draw inferences, weigh the credibility of the witness, and weigh the evidence, there is insufficient evidence in this case to support a verdict for the plaintiff. As was clearly stated in *Massie v. Firmstone*, a plaintiff cannot rise above his own testimony and "ask that his case be made stronger than he makes it." *Id.*, 134 Va. 450, 462, 114 S.E. 652, 656 (1922). Simply stated, LCS has not proved all the necessary elements of actual fraud in this case. As a matter of law, LCS has not presented sufficient evidence of a false representation of a material fact that was made intentionally and knowingly with the intent to mislead, nor has it proved any damages that flow from any such misrepresentation. Therefore, the jury verdict as to compensatory damages will not be reinstated.