**Rock E. WHITE, Plaintiff,**

v.

**Nicholas L. POTOCSKA, P.C., Nicholas L. Potocska, and Pamela G. Potocska, Defendants, Counter Claimants,**

v.

**Rock E. White, Ali E. Gunbeyi, and Evelyn S. Eidem, Counter Defendants.**

**Action No. 2:07cv343.**

United States District Court,
E.D. Virginia,
Norfolk Division.

Dec. 3, 2008.

Mary Jane Hall, Patrick H. O'Donnell, for Plaintiff.

Thomas B. Kelly, Corrynn J. Peters, for Defendants.

### OPINION AND ORDER

MARK S. DAVIS, District Judge.

This matter is before the Court on the Counter Defendants' Motion for Summary Judgment on the Counterclaim, Plaintiff's Motion for Summary Judgment on the Complaint, and Plaintiff's Motion to Bifurcate Trial of Plaintiff's Request for Attor-

neys' Fees from Case in Chief. The Court heard oral argument on Friday, October 10, 2008, and the motions are now ripe for decision.

This matter stems from the sale of Rock White & Associates to Nicholas L. Potocska. The original Complaint and Amended Complaint seek payment on a $145,000.00 promissory note used as partial payment for the purchase of Rock White & Associates. The Counterclaim alleges actual fraud, constructive fraud, conspiracy to commit fraud, breach of contract, and seeks reformation of contract.

## I. Factual and Procedural History

Nicholas L. Potocska ("Potocska") is a certified public accountant ("CPA") and principal shareholder of Nicholas L. Potocska CPA, P.C. ("Potocska P.C."), a Virginia accounting firm. Pamela G. Potocska ("Mrs.Potocska") is the wife of Potocska. Both Potocska and Mrs. Potocska personally guaranteed the promissory note ("Note") which is the subject of the Complaint and Amended Complaint.

Rock White & Associates, Inc. ("RW & A") is the financial services firm that was purchased by Potocska. RW & A operated from an office in Virginia. Rock E. White ("White") was the majority shareholder of RW & A prior to the sale of the firm to Potocska. Ali E. Gunbeyi ("Gunbeyi") was a shareholder of RW & A, Chief Operating Officer, and Vice–President of Consulting for RW & A. Evelyn Eidem ("Eidem") was a shareholder and employee of RW & A. She primarily worked remotely from Texas.

In January, 2005, White moved from Virginia to Hawaii, leaving Gunbeyi and Eidem to run the day-to-day operations of RW & A. In Spring 2006, RW & A came on the market. In mid-June, Potocska expressed an interest in purchasing RW & A. On June 29, 2006, Gunbeyi provided Potocska with a book asset detail, which listed the equipment owned by RW & A, and guided Potocska on a tour of RW & A's offices. On July 13, 2006, Potocska tendered his first letter of intent offering $750,000.00 for RW & A. On July 26, 2006, Gunbeyi and Eidem met with Potocska for lunch. White later negotiated with Potocska,[1] and on August 21, 2006, Potocska signed an amended letter of intent offering $775,000.00. Potocska then undertook a "due diligence" investigation before going forward with the purchase. Potocska was provided with a computer work station in White's old office at RW & A's offices and allowed to examine the firm's records. White advised Potocska that he was not to reveal to clients or staff the purpose of his presence at RW & A. Potocska was introduced as a "possible investor" and "possible client." (Potocska Aff. ¶ 15.) Leon Faris, the business broker ("Broker"), also required Potocska to sign a confidentiality agreement which precluded him from "revealing any aspect of the sale to RWA clients and staff unless the owners specifically gave [him] permission to do so." (Potocska Aff., ¶ 15.)

Potocska spent a little over five hours at RW & A's offices on September 26, 2006 and four and one-half hours there on September 27, 2006. Potocska was given Yelena Laratta's ("Laratta") computer password to access the computer system. Laratta was another accountant at RW & A, who also acted as the liaison with Xcentric, the outside information technology firm that serviced RW & A's computer

---

1. Eidem and Gunbeyi did not take part in the negotiations for the sale of RW & A. The negotiations appear to have been primarily between White and Potocska (through an intermediary after October 23, 2006). Gunbeyi's primary role appears to have been to provide information requested by Potocska during his due diligence investigation. In addition, Gunbeyi would correct information and advise Potocska of changes in the information.

system. Laratta answered several of Potocska's questions about the computer during his days at RW & A's offices.

Being unfamiliar with the Creative Solutions and Practice Solutions software used by RW & A and not knowing the passwords to access certain subdirectories, Potocska found examining the computerized records to be difficult.[2] Therefore, he began to ask Gunbeyi to also manually provide him with information that he wished to examine. During his due diligence, Potocska found a number of accounts where clients had prepaid for services that were not yet complete (referred to as WIPs for "work in progress"). The parties agreed that the value of these accounts would not change the purchase price, but would rather be used as setoffs or payments toward the purchase price. On October 6, 2006, Potocska revised his letter of intent wherein he offered $715,000.00 for the purchase of RW & A. On October 18, 2006, Gunbeyi sent Potocska a client list that Potocska requested. In light of Potocska's changes to the letter of intent and disparaging comments about the state of RW & A, White put the firm back on the market. On October 20, 2006, White wrote Potocska a lengthy email, explaining why he felt Potocska's offer was too low. White also stated that RW & A did not "need" to sell to Potocska. White stated that it appeared that Potocska was looking for a perfect firm. White admitted his firm was not perfect. However, White advised Potocska that Potocska might regret missing out on the opportunity to expand his business if he failed to go through with the purchase of RW & A. After October 23, 2006, Potocska and White did not have any further dealings directly; all dealings were transacted through the Broker and attorneys.

On October 30, 2006, Gunbeyi was advised that Carpe Diem, RW & A's biggest account, was considering putting the business up for sale, which was not unusual because Carpe Diem had been in various sales discussions for the past five years. Carpe Diem appears to have been in tentative talks with Brookline. Gunbeyi had a discussion with Brookline, on October 30, 2006, and his notes from that discussion indicate that Brookline wanted to move "back office" functions to the Daytona, Florida area. However, this information was not communicated to Potocska. In mid-November, Elliot Faircloth ("E.Faircloth"), the Executive Director of Carpe Die m, advised Gunbeyi by email that Carpe Diem had decided not to sell. (Gunbeyi Aff. ¶ 37.)

On October 31, 2006, Potocska submitted his final letter of intent. Potocska used the data regarding clients, provided by Gunbeyi on October 18, 2006, to produce what would become Exhibit C to the Accounting Practice Asset Purchase Agreement ("APA").[3] Exhibit C is a list of clients and the billings associated with each client. Potocska added information and notations to this document over the course of his due diligence. The parties, by email, exchanged this document in Excel format, which could be changed by any party. Throughout the negotiations, Gunbeyi also made changes to the document, adding material and highlighting his additions to differentiate them from Potocska's work.

In Exhibit C, Potocska had placed asterisks by the names of certain clients and

---

**2.** Creative Solutions is a brand of software for multiple office functions. Practice Solutions is the accounting software that was used by RW & A. Potocska had never used Creative Solutions and Practice Solutions software before.

**3.** The APA is the final version of the contract for the sale of RW & A, which has numerous attachments and exhibits.

notations such as "I have confirmed that the annual fees are correct and [the client] intends to continue using the services listed until 12/31/07—signed MOS attached."[4] Exhibit C also contained an initial block in the lower right corner of each page as follows: "Initial to confirm ____". White received the last "I have confirmed" version of Exhibit C on December 1, 2006. For the first time, Exhibit C was in PDF format and could not be changed by White or Gunbeyi. In a return email, White did question who was "I." However, Potocska never specifically responded to this email. On Tuesday, December 5, 2006, White received an email from the Broker with Exhibit C as an attachment. In the email, Potocska stated that he had "cleaned up the formatting" for Exhibit C "with no numeric changes whatsoever." However, Potocska had changed all of the "I have confirmed" notations to "RW & A has confirmed." The White Defendants assert that the "Initial to confirm ____" spaces on Exhibit C were also removed in this revised version of Exhibit C. However, the

Exhibit C attached to the Potocska Claimants' Answer and Counterclaim, and represented to be the attachment to the final signed APA, does in fact reflect the presence of the "Initial to confirm ____" blocks, though the blanks contain no writing whatsoever.[5]

On December 3, 2006, White, by email, asked Eidem to read the APA. After reading the APA, Eidem emailed White asking why Section 4.6 of the APA[6] included the Texas clients,[7] which she asserted were clients solely because of their personal relationship with her. These clients were close friends of Eidem's. Eidem threatened to not sign the APA if these clients were not exempted. In his email response, White reminded Eidem that the Texas clients were the clients of RW & A and not her personal clients. White also advised Eidem that if these clients were excluded from the non-compete section, it would result in a dollar for dollar reduction in the price. White also counseled her regarding the alternatives if she refused to sign the agreement.[8] Eidem replied by

---

**4.** MOS refers to a menu of services ("MOS"). Some, but not all, of RW & A's clients signed a MOS, which indicates which services they wished RW & A to perform for them. Clients were able to cancel these services with ten-days notice. Unless a client cancelled the MOS, it would self-renew each year.

**5.** Because the version of the APA and Exhibit C that were attached to Exhibit 6 to the White Defendants' Motion for Summary Judgment does not show the "Initial to confirm ____" language, and because Exhibit 6 was represented to contain the final APA with exhibits, it appears that on the copy of Exhibit C provided by Potocska (or his representative) to the White Defendants after closing, the "Initial to confirm" block which was on the bottom of the pages was cut off at some point—perhaps when copies were made. The Exhibit 6 version has Exhibit C laying at an angle such that the location of the "Initial to confirm ____" block would be cut off the page, if it were otherwise there as reflected in Potocs-

ka's version attached to the Answer and Counterclaim.

**6.** Section 4.6 of the APA required White, Gunbeyi, and Eidem not to compete with Potocska, including not enticing clients away from RW & A wherever located and not to compete within a seventy-five mile radius.

**7.** The Texas clients included two small companies in which Eidem had a 25% ownership interest, and companies whose owners were her personal friends.

**8.** White suggested that one alternative would be that she and Gunbeyi, and possibly Laratta, continue to buy him out and assume the proportionate share of the financial obligations. White suggested that another alternative would be to dissolve the firm. However, White reminded Eidem that dissolving the firm would require her to pay back the balance on a note held by White for her partnership interest, and she would also have to pay her share of the firm debt payoff.

email that she only asked because if she ever left RW & A, she would like "to be able to work with these clients if the opportunity arises." (Counter Claimants' Ex. 6.)

Potocska requested information and reports regarding RW & A up through December 6, 2006 (the day before closing), and RW & A provided information. On December 7, 2006, Potocska's attorney sent White the final version of the contract portion of the APA in an email, explaining that he would later attach the schedules and exhibits that White "had already seen and agreed upon." The attorney stated that he had "messed up" and did not save a black-lined version which would show the changes made. Potocska's attorney also attached a three-year MOS for Beach Trucks and for Western Branch Properties, companies in which White had substantial ownership interest. White emailed Potocska's attorney stating that he despised the tactic of renegotiating at such a late stage and stating that extending terms for these clients was never discussed. However, White signed and faxed the MOSs for these companies. In a telephone conversation, White had Potocska's attorney point out any and all changes that had been made to the "APA." The attorney did not mention any changes to Exhibit C of the APA. Also, on December 7, 2006, Delores Perry, the sole owner of Perry Benefit Group, LLC, informed Gunbeyi that she would be terminating her sublease.[9]

The closing occurred on December 8, 2006. At that time the parties signed the APA, which was the final document reflecting their negotiations. However, Exhibit C was not attached to the APA at closing, and Potocska did not have an initialed "RWA has confirmed" version of Exhibit C. Instead, Potocska's attorney represented that the Exhibit C they had each previously approved would be attached later. The final purchase price was $768,566.00. The WIP credit in the APA was $123,566.00 (with the potential of an additional $25,000.00 credit for any WIP found by May 31, 2007). Potocska paid $480,000.00 in cash. Potocska made the Note in the amount of $145,000.00. The Note was payable solely to White. Potocska's down payment of $20,000.00 was applied to the purchase price.

On or about December 17, 2006, Delores Perry, who had told Gunbeyi on the day before closing that she would not be renewing her lease, told an employee at RW & A that she was cancelling the use of RW & A services. Approximately one month after closing, Eidem tendered her resignation, following two contentious interactions with Potocska. Subsequently, the clients in Texas terminated their business with RW & A and became clients of the Texas-based firm for which Eidem went to work after leaving RW & A. In January 2007, Gunbeyi sought advice from Potocska regarding the potential sale of Carpe Die m, which was apparently again considering a sale.

In April 2007, Carpe Diem received a letter of intent from Brookline. Potocska hired additional personnel to perform the work of providing Brookline with the information necessary to conduct its due diligence. Carpe Die m's year-end financials were not finished on time, and Carpe Diem terminated their relationship with RW & A approximately ten months after the closing of the sale of RW & A.

---

9. The building where RW & A and Perry Benefit Group leased space was owned by Western Branch Properties, in which White owned a 51% interest. Perry told Gunbeyi she was terminating her lease because she believed that Gunbeyi managed the property for White.

Potocska asserts that in April 2007, White sold his interest in Western Branch Properties to John Faircloth ("J.Faircloth"). (Counter Defs.' Ex. 10, p. 37.) J. Faircloth then cancelled the property management portion of the contracted work that was to be performed by RW & A. On May 4, 2007, Gunbeyi resigned to go to work for Career Services, a former client of RW & A. In May 2007, Potocska sought setoff for WIP prepayments and Questioned Clients that did not remain with RW & A. White denied setoff and sought payment for certain setoffs taken at closing that he asserted were inaccurate as well as for work performed. Potocska ceased paying on the Note beginning June 1, 2007. Thereafter, White directed that Beach Trucks cease paying RW & A for work that had been done. In July 2007, Western Branch Properties cancelled accounting and tax services with RW & A.

White filed the Complaint beginning this action on July 25, 2007. White filed a Motion for Leave to File an Amended Complaint, which was granted by order entered October 30, 2007. In his Amended Complaint, White admitted that the Potocska Claimants are entitled to some offsets on the Questioned Accounts and customer prepayment credits, alleges that the Potocska Claimants are in default on the Note they endorsed upon sale of the business, and seeks "judgment for the entire principal balance due under the Note, less the legitimate and allowable offsetting adjustments claimed by Defendants and described in paragraphs 16 through 19, plus interest, late fees, costs, and reasonable attorney's fees."

On September 4, 2007, Defendants Potocska, Potocska, P.C., and Mrs. Potocska ("Potocska Defendants" or "Potocska Claimants") filed their Answer and Counterclaim. In their Counterclaim against Plaintiff White and the newly named Counterclaim Defendants, Gunbeyi and Eidem, the Potocska Claimants assert a claim for actual fraud (Count 1), constructive fraud (Count 2), conspiracy to commit fraud (Count 3), breach of contract (Count 4), and reformation of the contract (Count 5), seeking compensatory damages of $500,000.00, punitive damages, attorneys fees, costs and interest. On September 19, 2007, Counter Defendants White, Gunbeyi, and Eidem ("White Defendants") filed their Answer to the Counterclaim.

On May 2, 2008, the White Defendants filed the Motion for Summary Judgment on the Counterclaim and on the Complaint as amended. On May 20, 2008, the Potocska Claimants filed their Response in Opposition to the Motion for Summary Judgment. On May 23, 2008, the White Defendants filed their Reply. The Court heard oral argument on October 10, 2008.

## II. Analysis

### A. Standard on Motion for Summary Judgment

Summary judgment is appropriate only when a court, viewing the record as a whole and in the light most favorable to the nonmoving party, determines that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also, Celotex Corp. v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Seabulk Offshore, Ltd. v. Am. Home Assurance Co.,* 377 F.3d 408, 418 (4th Cir.2004). The moving party has the initial burden to show the absence of an essential element of the nonmoving party's case and to demonstrate that the moving party is entitled to judgment as a matter of law. *Honor v. Booz–Allen & Hamilton, Inc.,* 383 F.3d 180, 185 (4th Cir.2004); *McLean v. Patten Cmtys., Inc.,* 332 F.3d 714, 718 (4th Cir. 2003); *see Celotex Corp.,* 477 U.S. at 322–25, 106 S.Ct. 2548. When the moving party has met its burden to show that the

evidence is insufficient to support the non-moving party's case, the burden then shifts to the nonmoving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Honor*, 383 F.3d at 185; *McLean*, 332 F.3d at 718–19. Such facts must be presented in the form of exhibits and sworn affidavits. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. 2548; *see also M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc.*, 981 F.2d 160, 163 (4th Cir.1993). Failure by a plaintiff to rebut a defendant's motion with such evidence on his behalf will result in summary judgment when appropriate. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.* 477 U.S. at 322, 106 S.Ct. 2548.

Although a court must draw all justifiable inferences in favor of the nonmoving party, in order to successfully defeat a motion for summary judgment, the nonmoving party must rely on more than conclusory allegations, "mere speculation," the "building of one inference upon another," the "mere existence of a scintilla of evidence," or the appearance of "some metaphysical doubt" concerning a material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 649 (4th Cir. 2002); *Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*, 330 F.Supp.2d 668, 671 (E.D.Va.2004). Rather, the evidence must be such that the fact-finder reasonably could find for the nonmoving party. *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

Summary judgment is not a "disfavored procedural shortcut." *Celotex Corp.*, 477 U.S. at 327, 106 S.Ct. 2548; *Sibley v. Lutheran Hosp. of Md., Inc.*, 871 F.2d 479, 483 n. 9 (4th Cir.1989); *Brown v. Mitchell*, 327 F.Supp.2d 615, 628 (E.D.Va.2004). Rather, the summary judgment procedure is properly regarded as an "integral part" of the Federal Rules of Civil Procedure, which are designed to obtain a just, expeditious, and inexpensive resolution of every civil matter. *Celotex Corp.*, 477 U.S. at 327, 106 S.Ct. 2548; *Sibley*, 871 F.2d at 483 n. 9; *Graham v. Pactiv Corp. Benefits Comm.*, 301 F.Supp.2d 483, 491–92 (E.D.Va.2004).

With respect to Potocska's fraud claims, he bears the burden of proof by clear and convincing evidence, rather than the typical preponderance standard. The Supreme Court has observed that "the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidence standard of proof that would apply at trial on the merits." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Therefore, with respect to the fraud claims, if the White Defendants show the absence of any genuine issue of material fact, this Court must determine whether the Potocska Claimants have brought forth sufficient facts to meet the "clear and convincing" evidence standard of proof required to support an allegation of fraud under Virginia law. *Ludwick v. Premier Bank North, Inc.*, 935 F.Supp. 801, 807 (W.D.Va.1996); *DiMagno v. Zachman*, 36 F.3d 1092, 1994 WL 529894, *11 (4th Cir.1994) (unpublished disposition).

## B. Positions of the Parties

As a preliminary matter, the Court notes that the Potocska Claimants have made numerous contentions that would implicate new claims that are not set forth in

the Counterclaim. However, the Potocska Claimants have not moved to amend the Counterclaim pursuant to either Rule 13(e) or (f) of the Federal Rules of Civil Procedure. Accordingly, because these issues are not properly before the Court, the Court will not address such extraneous contentions. *Shanahan v. City of Chicago,* 82 F.3d 776, 781 (7th Cir.1996) (holding that a complaint cannot be amended by a brief in opposition to a motion for summary judgment); *cf. State Mut. Life Assur. Co. v. Leimer, et al.,* 3 F.R.D. 145 (W.D.Mo.1942) (noting that counterclaim must meet the same pleading requirements as a complaint).

The Court has attempted to recite the specific contentions of each party at the beginning of the discussion of each claim, though some of the arguments are somewhat disjointed. There are several arguments that cover numerous claims. Therefore, the Court will attempt to summarize those here.

With respect to the fraud claims, the Potocska Claimants allege that the White Defendants fraudulently induced Potocska to enter into the APA to his detriment. The Potocska Claimants have numerous theories of fraudulent actions on the part of the White Defendants. Each action is alleged to have constituted actual and constructive fraud.

The Potocska Claimants also assert that the Court should create an exception to the rule that one who undertakes due diligence is bound by all that could have been learned through a complete investigation, because Potocska was unfamiliar with the computer software used by RW & A, and thus, could not access all information himself. In addition, they contend that Potocska was not allowed to talk with clients or staff members other than Gunbeyi, who Potocska claims did not have time to assist him and was himself unable to navigate the computer system, and Eidem, who worked remotely in Texas. They also assert that White would not allow them to seek assistance from any other employees of RW & A. The Potocska Claimants contend that these constraints prevented Potocska from learning of the misrepresentations made by the White Defendants.

The White Defendants make a general contention that the Potocska Claimants are precluded from asserting fraud claims because Potocska undertook due diligence, and thus, under Virginia law, they are charged with knowledge of everything he could have learned through a complete investigation and may not claim to have relied on representations made by the White Defendants. Moreover, they assert that everyone in the office, except the receptionist, knew about the potential sale to Potocska and, thus, Potocska could have sought assistance with the computer system from any of them.

### C. Fraud

Before beginning an analysis of the Potocska Claimants' numerous fraud claims, the Court will review the legal doctrines applicable to such fraud claims. But first, the Court must determine which jurisdiction's law to apply.

The Potocska Claimants allege the tort of fraud. When a cause of action arises in tort, Virginia applies the law of the state where the tortious conduct or injury occurred. *Hitachi Credit America Corp. v. Signet Bank,* 166 F.3d 614, 628 (4th Cir.1999) (citing *Jones v. R.S. Jones & Assocs.,* 246 Va. 3, 5, 431 S.E.2d 33 (1993)). When a choice of law clause is broad enough to encompass contract-related tort claims such as fraudulent inducement, the Court of Appeals for the Fourth Circuit has honored the intent of the parties to choose the applicable law. *Id.* The choice of law language in Section 9.11 of the APA is broad enough to cover tort and contract

claims arising from the parties' agreement.[10]

■ In Virginia, a claim of fraud requires proof by clear and convincing evidence of all elements of fraud:

(1) a false representation, (2) of material fact, (3) made intentionally and knowingly, (4) with the intent to mislead, (5) reliance by the party misled, and (6) damages resulting from that reliance.

*Bank of Montreal v. Signet Bank,* 193 F.3d 818, 826 (4th Cir.1999) (citing *Van Deusen v. Snead,* 247 Va. 324, 327, 441 S.E.2d 207 (1994)). However, any reliance on the representations of another must be reasonable. *Hitachi,* 166 F.3d at 629.

■ Virginia also recognizes "concealment," otherwise known as fraud by omission. "Concealment of a material fact by one who knows that the other party is acting upon the assumption that the fact does not exist constitutes actionable fraud." *Bank of Montreal,* 193 F.3d at 827 (quoting *Allen Realty Corp. v. Holbert,* 227 Va. 441, 450, 318 S.E.2d 592 (1984)). However, where there is no duty to disclose, silence does not constitute concealment. *Id.* Fraud by concealment requires actual intent to conceal a fact and reckless non-disclosure is not actionable. *Bank of Montreal,* 193 F.3d at 827.

■ Representations intended to convince another that an issue does not exist may constitute fraud where the other person relies on such representations to his detriment. *Packard Norfolk, Inc. v. Miller,* 198 Va. 557, 563, 95 S.E.2d 207 (1956).

A duty to disclose does not normally arise when parties are engaged in an arm's length transaction. A duty may arise (1) if the fact is material and the one concealing has superior knowledge and knows the other is acting upon the

assumption that the fact does not exist; or (2) if one party takes actions which divert the other party from making prudent investigations (e.g., by making a partial disclosure).... Obviously, the concealment itself cannot constitute one of these diversionary actions—then there would always be a duty to disclose.

*Bank of Montreal,* 193 F.3d at 829.

■ Where one person seeks to hold another person liable for fraud, he must show that he relied on the representations of that person. *Harris v. Dunham,* 203 Va. 760, 767, 127 S.E.2d 65 (1962). However, where the person makes "his own investigation, whether complete or not, into the subject matter at hand" he may not say that he relied on the representations of another. *Id.* In *Harris,* Dunham, an experienced businessman undertook a partial investigation of a franchise prior to purchasing the stock of the franchise. Dunham had been told that the franchise would generate income of $25,000 a year. Dunham examined the corporate books and records as well as financial statements and operation records of the individual stores. *Id.* at 765, 127 S.E.2d 65. After Dunham took over the operation, he discovered the franchise was not as profitable as he had been told, and in fact, the business was losing money at an increasing rate. *Id.* at 766–767, 127 S.E.2d 65. The *Harris* court determined that the information Dunham was provided revealed the past trend, which showed a decline in business. *Id.* at 768, 127 S.E.2d 65. Moreover, Dunham failed to take steps he could have taken, such as inspection of the stores and talking with the store operators. *Id.* Thus, the court found that Dunham could not claim to have relied on

---

**10.** Even if the language of the APA was not broad enough to cover tort claims, the alleged tortious conduct and injury appears to have occurred in Virginia, and therefore Virginia law would apply. *Hitachi,* 166 F.3d at 628.

representations made by the sellers of the stock.

■ Conversely, in *Hitachi*, the Fourth Circuit found that where a confidentiality agreement, which precluded Hitachi from contacting Philip Morris, prevented Hitachi from investigating further than it did and that Hitachi was forced to rely on the representations made by Signet Bank, Hitachi's partial investigation did not foreclose a claim in fraud. *Hitachi*, 166 F.3d at 630.[11] Thus, one who undertakes an investigation is bound by all that he **could have** learned. However, if he is prevented from learning facts because of actions of the other party, an action for fraud may lie.

■ If a person makes a promise that, at the time made, he does not intend to perform, that promise is a misrepresentation of present fact and may form the basis of a claim of actual fraud. *Richmond Metro. Auth. v. McDevitt Street Bovis, Inc.*, 256 Va. 553, 559–60, 507 S.E.2d 344 (1998). "Under no circumstances, however, will a promise of future action support a claim of constructive fraud." *Supervalu v. Johnson*, 276 Va. 356, 368 n. 2, 666 S.E.2d 335 (2008) (specifically overruling any suggestion in *Eden v. Weight*, 265 Va. 398, 578 S.E.2d 769 (2003), that a present state of mind implies that an action for constructive fraud may lie); *see*

*also Richmond Metro. Auth.*, 256 Va. at 560, 507 S.E.2d at 348.

■ Where a contractual representation is breached, and the parties owe no common law duty outside of the contract, the claim sounds in contract, not tort. *Richmond Metropolitan Authority.*, 256 Va. at 559, 507 S.E.2d 344 (1998) (rejecting claims of fraud based on contractual obligations that were breached).

■ The Virginia Supreme Court has further explained the distinction between tort and contract as follows:

The distinction is this: If the cause of complaint be for an act of omission or nonfeasance which, without proof of a contract to do what was left undone, would not give rise to any cause of action (because no duty apart from contract to do what is complained of exists) then the action is founded upon contract, and not upon tort. If, on the other hand, the relation of the plaintiff and the defendants be such that a duty arises from that relationship, irrespective of contract, to take due care, and the defendants are negligent, then the action is one of tort.

*Oleyar v. Kerr*, 217 Va. 88, 90, 225 S.E.2d 398 (1976). However, a contract will not negate a tort claim of fraud in the inducement of the contract, as the inducement

---

**11.** In *Hitachi*, Reiners, a former employee of Philip Morris, claimed he was in charge of a secret project, Project Star, to determine the long-term effects of cigarette smoking. In 1993, He sought a loan from Signet Bank to finance equipment leases. He told Signet Bank the project was so secret that they could not contact Phillip Morris, and if they did, Phillip Morris would deny the project and deny that Reiners was an employee of Philip Morris. *Id.* at 619. In 1995, Signet syndicated portions of the loan to other banks. Hitachi was interested in financing the leases only if Phillip Morris was the lessee. Hitachi sought assurance from Signet Bank that Phillip Morris was in fact the underlying lessee

for Project Star. *Id.* at 621. The confidentiality agreement that Signet Bank required Hitachi to sign prevented Hitachi from contacting Phillip Morris. Signet Bank assured Hitachi that Phillip Morris was the underlying lessee. Signet Bank did not disclose to Hitachi that internally there were questions whether Reiners actually had the authority to act for Phillip Morris. The Fourth Circuit found that the district court erred in dismissing Hitachi's fraud claim under Rule 12(b)(6), because the confidentiality agreement prevented Hitachi from fully investigating the involvement of Phillip Morris and Hitachi could be found to have reasonably relied on the representations of Signet. *Id.* at 630.

precedes the contract. *Hitachi*, 166 F.3d at 631, n. 9.

▪ Under Virginia law, constructive fraud:

> requires proof that a false representation of a material fact was made, innocently or negligently, and that the injured party suffered damage as a result of his reliance on the misrepresentation. In addition, the evidence must show that the false representation was made so as to induce a reasonable person to believe it, with the intent that the person would act on this representation.

*Signet Bank*, 193 F.3d at 826–27. Only if there is a duty to disclose can concealment be the basis of a constructive fraud claim. *Cohn v. Knowledge Connections, Inc.*, 266 Va. 362, 367, 585 S.E.2d 578 (2003). However, any duty must be a duty arising under common law, not the contract itself. *Foreign Mission Bd. v. Wade*, 242 Va. 234, 241, 409 S.E.2d 144 (1991).

The Court now turns its attention to the individual fraud claims.

### 1. Carpe Diem

▪ The Potocska Claimants contend that the White Defendants engaged in actual fraud and constructive fraud when they failed to disclose to Potocska the information that Carpe Die m, one of RW & A's largest accounts, was considering putting itself on the market to be sold. Potocska alleges that Carpe Diem also discussed moving its "back room" operations, including accounting, to Florida. Potocska claims he would not have purchased RW & A if he had known about the potential sale. The Potocska Claimants assert that as a result of Brookline tendering a letter of intent for Carpe Die m, employees at RW & A had to perform hundreds of hours of work to facilitate Brookline's due diligence, which interfered with the timely conclusion of the other work that RW & A and Potocska P.C. had to perform.

The White Defendants contend that the possible purchase of Carpe Diem was speculative at best and that Carpe Diem had been considering putting the company on the market for five years. In mid-November 2006, E. Faircloth decided not to sell Carpe Die m. Moreover, they argue that the likely outcome of the sale of Carpe Diem would have been increased business for Potocska from the company purchasing Carpe Die m. They point out that Carpe Diem was never purchased and argue that no damages resulted from the failure to advise Potocska of the possibility that Carpe Diem might sell itself to another entity. Finally, they contend that Gunbeyi's notes showing that Carpe Die m was considering sale were in the client's paper file, and thus, this information could have been learned by Potocska through due diligence prior to the sale.

The record shows that Gunbeyi did learn on October 30, 2006, that Carpe Diem was considering sale of the firm to a number of companies, including Brookline. However, Gunbeyi's unrebutted affidavit states that well before the closing took place he received an email from E. Faircloth, Executive Director of Carpe Die m, advising Gunbeyi that Carpe Diem had decided not to sell. (Gunbeyi Aff. ¶ 37.)

Even had the sale materialized, E. Faircloth specifically denies the intent to move accounting services to Florida. (E. Faircloth Aff. ¶ 5.) In April 2007, Carpe Diem received a letter of intent from Brookline. RW & A worked on the due diligence investigation for Carpe Die m. Carpe Diem was not sold. Carpe Diem did not move its accounting operations to Florida. Nevertheless, Carpe Diem did terminate its association as a client with RW & A approximately ten (10) months after Potocska purchased RW & A, based on Potocska's failure to provide timely year-end

financials, for which Carpe Diem had prepaid. (E. Faircloth Aff. ¶ 10.)

The claim regarding Carpe Diem fails for a number of reasons. The Potocska Claimants have failed to establish the last requirement of a claim of fraud, namely that they suffered damages as a result of the White Defendants' failure to advise them that Carpe Diem was considering several options, including sale of the firm. Carpe Diem was never sold. Accounting functions were not moved to Florida. Carpe Diem terminated their relationship with RW & A for failure to provide timely year end financials and dissatisfaction with the services they received. (E. Faircloth Aff. ¶ 10.) There is no causal link between the alleged concealment and the damages suffered. "The proximate cause of an event is that act or omission which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the event and without which that event would not have occurred." *Cohn*, 266 Va. at 369, 585 S.E.2d 578. While Potocska does not believe that Carpe Diem ceased using RW & A because they were dissatisfied with the service they received after closing, the fact remains that Carpe Diem's Executive Director, E. Faircloth, has submitted an affidavit stating that the reason he left RW & A was because the year-end financial report was not prepared in a timely fashion and they were dissatisfied with the service. Client retention after closing is a known challenge faced by a purchaser of this type of firm. The most that the record shows is that Potocska failed to retain this particular client.

Moreover, the Potocska Claimants' assertion, that they could not complete the year-end financial report because Brookline's tender of a letter of intent to purchase Carpe Diem caused RW & A to be required to perform significant amounts of work to assist Brookline in performing the due diligence investigation, is unavailing.

This is precisely the kind of work that a financial firm such as RW & A performs. Such letters of intent for a business client can come at any time.

Furthermore, and perhaps more importantly, Gunbeyi's notes from his conversations with Carpe Diem and Brookline **were in the paper file** for Carpe Diem and available to Potocska during his due diligence. (Gunbeyi Aff. ¶ 36.) Potocska chose the method and extent of his due diligence. The paper files were available to him, and he did not have to navigate the computer system to access this file. This was RW & A's largest client. Even if no other paper files were requested, a prudent purchaser should have requested all information about this particular client. *Harris*, 203 Va. at 767, 127 S.E.2d 65. Having failed to do so, the Potocska Claimants cannot be heard to complain.

Accordingly, the White Defendants' Motion for Summary Judgment on this claim is **GRANTED**.

### 2. WIP Prepayments

The Potocska Claimants point to several provisions of the APA that they allege were inaccurate. They claim that Potocska relied on these representations in deciding to purchase RW & A. For example, the Potocska Claimants assert that many clients had paid for work that was not yet complete, otherwise know as WIP, and that WIP totals found after closing were greater than the $25,000.00 allowed for in the APA, which caused Potocska to have to perform work for which he will not be paid. Moreover, when Potocska submitted a request for setoff to White, White denied the request. Therefore, the Potocska Claimants assert that White never intended to allow any setoff, and only provided for setoff to induce Potocska to purchase RW & A.

The White Defendants contend that many of the alleged WIP claims for which

Potocska sought setoff are inaccurate and are not in fact WIP, but work that should be billed when completed. They assert that all of the WIP prepayments could have been learned by Potocska through his due diligence. The White Defendants contend that any failure to pay Potocska for WIP claims sounds solely in contract and cannot form the basis of a fraud claim. In his Amended Complaint, White says he gives the benefit of the doubt and agrees that the Potocska Claimants are entitled to $11,566.00 of their $23,643.50 claim on this issue.

In his October 6, 2006 email, Potocska states that he has done 100 hours of due diligence and could do more, but that he does not have the time. The APA allowed for an additional $25,000.00 in WIPs if claimed by May 31, 2007. The Potocska Claimants assert that the amount of WIP prepayments amount to more than the contractual amount.

Where one person seeks to hold another liable for fraud, he must show that he relied on the representations of another. *Harris*, 203 Va. at 767, 127 S.E.2d 65. However, where the person makes "his own investigation, whether complete or not, into the subject matter at hand" he may not say that he relied on the representations of another. *Id.* The Potocska Claimants seek to have this Court carve out a new exception to this rule that would apply when one is unfamiliar with the computer application used by the company they seek to purchase.

Potocska chose the method of due diligence—namely, utilize the computer in part, and have Gunbeyi provide him with additional information at his request. Po-

tocska undertook an investigation into WIP prepayments and found many of them. There is nothing in the record to suggest he could not have found all of the alleged prepayments had he continued his due diligence. While it may be true that due diligence does not require a prospective purchaser to go through every piece of paper, prospective purchasers make a choice of how much information to review. The law in Virginia is that a prospective purchaser who undertakes due diligence is charged with knowledge of everything that he could have learned by going through every piece of paper that was available to him. *Harris*, 203 Va. at 767, 127 S.E.2d 65. The record suggests that Potocska focused his due diligence on finding prepayments. The mere fact that he chose to curtail his investigation before he found them all does not suggest fraud on the part of the White Defendants. Instead, the parties chose to address the possibility of additional WIP prepayments in the APA.

Potocska's unfamiliarity with the computer application used by RW & A does not excuse his failure to do a complete due diligence review. This is not a case where the actions of the White Defendants prevented Potocska from learning information. By his own admission, Potocska was prevented by ignorance of the computer system and failure to ask for or review additional information.[12] Potocska had various options available to him. He could have pressed for someone to assist him with the navigation of the computer system. If no one would help him, a prudent buyer would realize he is not going to be able to do a full investigation and look for

12. In his deposition, Potocska was asked whether he was prevented from reviewing any information he wished to review. Potocska responded; "If ignorance is a means of, of prevention, then the answer is yes." (Counter Defs.' Exhibit 5.) When asked about dis-

covery of additional prepayments, Potocska said: "The fact that I missed additional amounts just means that I didn't check 100 percent of everything, which no one can do." (Potocska transcript, pg. 93).

another firm to purchase, adjust his offer, or accept the risk and go forward with the purchase. The Potocska Claimants assert that Gunbeyi was too busy to help Potocska and Gunbeyi was unfamiliar with the accounting software. However, Potocska could have called Eidem and had her walk through the system with him. Moreover, Potocska could have asked for assistance from Laratta. Even though Potocska alleges that he could not talk with her about the sale, he claims that he was introduced as a possible investor. A possible investor would have to do the same or similar due diligence that Potocska had to perform. As Laratta did assist Potocska on several occasions,[13] he certainly could have asked for additional assistance from her without revealing that he was considering purchasing RW & A rather than simply becoming an investor. The confidentiality agreement in this case is not a blanket confidentiality agreement like the prohibition in *Hitachi*. *Hitachi*, 166 F.3d at 630. The confidentiality agreement, as described by Potocska in his affidavit, merely prohibited him from talking to staff and clients about the sale of RW & A.[14] Ultimately, responsibility for the failure to discover all the WIP rests at the feet of Potocska.

Moreover, the fact that more prepaid WIP existed was contemplated by the parties. Thus, Potocska cannot assert that he relied on the WIP totals being exactly correct. The parties included a provision in § 1.2(c) of the APA for an offsetting adjustment up to $25,000.00 for customer prepayment credit for prepayments found after closing. The parties negotiated this limitation. The mere fact that WIP may have exceeded the amount that was negotiated does not constitute fraud.

The Potocska Claimants also assert that this claim survives, because White rejected Potocska's claim for offset for WIP that Potocska found after closing. They assert that White never intended to pay the WIP offset. However, the Potocska Claimants have not provided any evidence to create a material issue of fact as to whether White intended to allow offset at the time he signed the APA. "Because fraud must involve a misrepresentation of a present or a pre existing fact, fraud ordinarily cannot be predicated on unfulfilled promises or statements regarding future events." *Supervalu*, 276 Va. at 356, 666 S.E.2d 335. The only substantive evidence that the Potocska Claimants have on this issue is the fact that White possibly breached the APA when he failed to honor Potocska's request for offset. However, the Potocska Claimants present no evidence to support a conclusion that White had a present intention, at the time he signed the APA, that he would not allow offset for any additional WIP.

Accordingly, the White Defendants' Motion for Summary Judgment on this claim is **GRANTED.**

### 3. Exhibit C

#### a. contentions

The Potocska Claimants allege that the White Defendants fraudulently misrepresented in Exhibit C to the APA that certain of the RW & A clients had committed to remaining with RW & A after the closing and through 2007. Moreover, the Potocska Claimants allege that the White Defendants fraudulently misrepresented in Exhibit C that MOSs for such clients were attached to Exhibit C.[15] They claim that

---

**13.** Laratta states that she did assist Potocska on several occasions when he had questions about computer issues. (Laratta Aff. ¶ 3.)

**14.** The confidentiality agreement was not provided to the Court.

**15.** Only four of the clients named by the Potocska Claimants are at issue. One of these four was already listed in the Questioned Accounts schedule, and the remaining three had an aggregate annual value of $2,950.00.

Exhibit C (the client list) of the APA does represent that RW & A verified that clients marked with asterisks would be continuing as clients after the closing and that signed MOSs were attached.[16] However, they allege that no MOSs were attached to Exhibit C for such clients, and the White Defendants never confirmed with these clients that they would be continuing with RW & A after closing.

The White Defendants allege that the version of Exhibit C that they approved before closing contained no affirmative representations on their part that clients would continue to use RW & A after the sale or that signed MOS agreements for such clients were attached. They go on to allege that no Exhibit C was attached to the APA at closing, and that a version different from that previously agreed upon was attached to the APA by counsel for the Potocska Claimants after closing. The White Defendants admit that Potocska forwarded a revised Exhibit C to them two days before closing which included the representations about client retention and MOSs being attached, but they contend that it was forwarded by Potocska with an email indicating that he had only "cleaned up the formatting on Schedule C ..."

The White Defendants also claim that most of these were small clients that normally came in early in the year to have their tax returns prepared, and that it would be contrary to normal practice to require them to promise to use RW & A the next year and to sign a MOS at the time that the sale of RW & A occurred. They claim that on December 5, 2006, at Potocska's request, they provided him with MOSs and extensive financial data reflecting client payment history for each client with an asterisk next to their name on the "I have confirmed" version of Exhibit C in existence at that time. The White Defendants also assert that, since Potocska did not require production of the MOSs at closing, he accepted Exhibit C without ever receiving the disputed MOSs, and this indicates he knew that the White Defendants had not made these representations. Finally, they assert that there is no evidence to support a finding that they knew that any of the clients listed in Exhibit C would not be continuing as clients.

The White Defendants make much of the fact that Potocska authored Exhibit C, and that originally, the notation about the future retention of clients stated that "I have confirmed." White received the "I have confirmed" version of Exhibit C on December 1, 2006. In a return email, White did question to whom "I" referred, but received no direct response.[17] They emphasize that on Tuesday, December 5, 2006, White received an email from the Broker with an attachment from Potocska, wherein Potocska stated that he had "cleaned up the formatting" for Exhibit C "with no numeric changes whatsoever." A copy of the reformatted Exhibit C was attached to the email. However, Potocska had changed "I have confirmed" to "RW & A has confirmed." White states that he

---

**16.** Section 1.8 of the APA states that "[p]rior to Closing, Seller shall deliver to Purchaser signed, binding Menu of Services agreement ("MOS") from each of the clients highlighted and outlined in yellow on page 22 of Exhibit C." The Potocska Claimants do not allege that the White Defendants failed to provide such binding MOS agreements from these clients listed on page 22, and the White Defendants assert that Potocska received the MOS agreements for the clients listed on page 22.

Therefore, it appears that the claim by the Potocska Claimants is based upon all the other clients listed on Exhibit C with asterisks by their name, of which only four are really at issue.

**17.** Potocska argues that his response was the subsequent change in the exhibit language from "I have confirmed" to "RWA has confirmed."

took Potocska at his word that only formatting changes had been made and did not review the substance again before closing three days later. Potocska states that it is not credible that White took him at his word because White did not trust him and therefore, would have reviewed Exhibit C, and thus White must have acquiesced in the change.

■ Absent fraud, mutual mistake, or duress, a person with the ability to understand a written document and who signs such document, is bound by his signature, whether or not he actually read the document. *Metro Realty of Tidewater, Inc. v. Woolard,* 223 Va. 92, 99, 286 S.E.2d 197 (1982). The White Defendants do not allege actual fraud by the Potocska Claimants in procuring Exhibit C. Therefore, the White Defendants are bound by their signatures as much as Potocska is bound by his signature.

The White Defendants also point out that no MOSs were attached to the version of Exhibit C that Potocska attached to the APA after closing, thereby suggesting that even if Potocska is not deemed to have accepted Exhibit C without the MOSs at closing, he is deemed to have accepted and approved Exhibit C as it was without the MOSs when it was attached to the APA in that incomplete fashion after the closing. The White Defendants assert that this indicates Potocska knew that they (the White Defendants) had not made these representations nor attached MOSs, because it was Potocska himself who made the representations.

### b. due diligence

This issue presents a number of concerns. In purchasing RW & A, Potocska was purchasing the client list, and he was concerned whether these clients would continue with the firm, thus allowing Potocska to recoup the money he had paid. Potocska asserts that his efforts at due diligence do not preclude this claim because he had signed a confidentiality agreement and therefore could not contact clients prior to the sale. Thus, he argues that he could not have determined whether all clients would continue through the next year.

A closer look at Potocska's affidavit reveals the nuances of this assertion. Potocska seeks to avoid the effect of the due diligence rule by alleging in his affidavit that his due diligence was compromised because he "signed a confidentiality agreement required by Mr. Faris which precluded me from revealing any aspect of the sale to RWA clients and staff unless the owners specifically gave me permission to do so. Mr. White and Mr. Gunbeyi never gave me permission to discuss the potential sale with any of RWA's staff, clients and/or people with which RWA did business." (Potocska Aff., ¶ 15.) However, the White Defendants claim that Potocska **never asked** to speak with these clients, and Potocska's affidavit does not dispute that assertion. This significantly undermines the assertion by the Potocska Claimants that the opportunity for due diligence was compromised.

### c. reliance

■ The reliance of Potocska on the alleged misrepresentations in Exhibit C must also be examined closely. It is clear from the record that, even if there had been no confidentiality agreement, no one could really guarantee that any clients would continue. The MOSs automatically renewed, and a signed MOS contained a provision that it could be cancelled with ten days notice. Thus, neither a verbal confirmation that a client would continue, nor a MOS, would guarantee a client's continuing use of RW & A. However, even if it is assumed Potocska could rely on a MOS to assure a client would remain under the new ownership, the reasonableness of such reliance must be questioned.

Perhaps the greatest obstacle for the Potocska Claimants' success on this fraud claim is the reasonableness of Potocska's reliance on these representations in Exhibit C, given that at the time the APA was signed, the MOSs Potocska asked for were not forthcoming and the White Defendants did not actually initial the blank next to the "Initial to confirm ____" block on each page of the exhibit to show that they had confirmed these clients would continue as clients with RW & A through 2007. As noted in the Court's discussion of Virginia fraud law above, any reliance on the representations of another must be reasonable and justified. *Hitachi*, 166 F.3d at 629.

In *Hitachi*, the Fourth Circuit explained that it is not enough for a plaintiff in a fraud action to show that it acted to its detriment in response to a defendant's false representation or concealment of a material fact. *Id.* at 629. To prove reliance, a plaintiff must demonstrate that its reliance "was reasonable and justified." *Id.*[18] "A plaintiff cannot claim that its reliance was reasonable and justified when it makes a partial inquiry, with full opportunity of complete investigation, and elects to act upon the knowledge obtained from the partial inquiry." *Id.* Furthermore:

> If false representations are made regarding matters of fact, and the means of knowledge are at hand and equally available to both parties, and the party, instead of resorting to them, sees fit to trust himself in the hands of one whose interest it is to mislead him, the law, in general, will leave him where he has

been placed by his own imprudent confidence. *Id.*

This was an arms length negotiation. The principals were not on speaking terms. Potocska, an experienced CPA should surely have noticed that the White Defendants had failed to provide him with precisely the evidence he claims he was relying on to reassure him that these clients were likely to continue using RW & A. In other words, Exhibit C having been referenced in the APA, Potocska is charged with the knowledge that the MOSs were not attached. As the White Defendants did not provide the signed MOSs at or after closing, Potocska could not rely on such signed MOSs. Potocska had also placed "Initial to confirm ____" blocks at the bottom of each page of Exhibit C. Again, as the White Defendants did not initial to confirm on Exhibit C, Potocska cannot have reasonably relied on them having confirmed. Therefore, Potocska's claim that he nevertheless relied on the assertion in Exhibit C, that the asterisked clients would remain throughout 2007, and that signed MOSs for such clients were attached, comes up short.

Potocska's purported reliance on these representations in light of the White Defendants' obvious failure to attach such MOSs is, at the very least, unreasonable, and it also seems unjustified. *Hitachi*, 166 F.3d at 629. Moreover, the White Defendants did not place their initials in the "Initial to confirm ____" block on each page of Exhibit C as Potocska had appar-

---

**18.** Justifiable and reasonable reliance are not the same thing. *Field v. Mans,* 516 U.S. 59, 70–71, 116 S.Ct. 437, 133 L.Ed.2d 351(1995). Reliance that is justifiable may not be reasonable. *Id.* While the majority of states require only justifiable reliance, *Id.* at 72–72, 116 S.Ct. 437, Virginia is one of the minority of states that requires the higher standard of reasonable reliance to establish fraud. *Id.*

(citing *Horner v. Ahern,* 207 Va. 860, 863–64, 153 S.E.2d 216 (1967) and explaining distinctions between justifiable reliance and reasonable reliance); *see Poe v. Voss,* 196 Va. 821, 86 S.E.2d 47 (1955) (where a party obtains information sufficient to excite the suspicions of a reasonably prudent person, he is then under a duty to ascertain the true condition for himself).

ently intended, making any reliance by Potocska even more unreasonable and unjustified. The record is replete with evidence that White and Potocska were not particularly fond of each other and did not trust each other. Under these circumstances, it is not reasonable for Potocska to assert that he relied on the assertion that RW & A had confirmed these clients and had them sign MOSs, when no Exhibit C was presented at closing; and no MOSs were proffered for attachment to Exhibit C at or after closing; and the White Defendants did not initial in the block entitled "Initial to confirm ____" at or after closing.

While this is enough to defeat the allegation of reasonable reliance, it bears noting that there is also no evidence in the record to show that the White Defendants were aware that any of the clients on Exhibit C would not be continuing to use RW & A. The Potocska Claimants point to Delores Perry as an example of a client that Gunbeyi, at least, knew would not be continuing as a client. In November 2006, she gave RW & A her taxes to prepare and asked for all of her records back afterward. (Perry Aff. ¶ 6.) On December 7, 2006, Perry advised Gunbeyi that she was terminating her sublease. *Id.* However, the sublease was through Western Branch Properties, not RW & A. (*Id.* ¶ 2.) It was not until ten days later, after closing, that Delores Perry advised anyone at RW & A that she was canceling the *services* of RW & A. Merely advising Gunbeyi that Perry intended to terminate her sublease with Western Branch Properties is different than telling RW & A that she no longer intended to use their financial services.

The Potocska Claimants also submit a number of affidavits from customers who did not continue with RW & A. Not one of these affidavits state that they told the White Defendants that they would not be continuing to use RW & A. Two of them

assert that, prior to closing, they told "RW & A" they would not be using RW & A, but do not specifically say that they told the White Defendants themselves. There is simply nothing in the record to show that the White Defendants were aware that these two clients had cancelled services. Moreover, the Potocska Claimants submitted the affidavit of RW & A employee Winter T. Arif, who states that when a client cancelled services, she would create a lost client checklist and email the accountant responsible to complete the checklist. In addition, she would instruct another employee to make the file inactive in the computer system. (Arif Aff. ¶ 14.) Thus, any lost clients could have been identified by Potocska during his due diligence investigation.

While it may be true that Potocska signed a confidentiality agreement that prohibited him from, in his words, "revealing any aspect of the sale to RWA clients and staff unless the owners specifically gave [him] permission to do so," he does not contradict the White Defendants' assertion that **he never asked** for such permission. Moreover, he had several other methods that were established by him to confirm the information on Exhibit C. Notwithstanding his failure to ask for permission to contact these clients, Potocska could have required production of the signed MOSs as provided in Exhibit C to the APA, but he did not do so. He could have required the White Defendants to initial the "Initial to confirm ____" blocks on Exhibit C reflecting they had confirmed the representations on such document, or inquired as to why all those confirmation blocks were left blank, but he did not do so. As the touchstone of reasonableness is prudent investigation, and Potocska failed to conduct a prudent investigation, it cannot be said that Potocska prudently relied upon the statements in Exhibit C to which he points. The Supreme Court of Virginia

said in *Poe v. Voss*, 196 Va. 821, 826, 86 S.E.2d 47 (1955), when addressing fraud claims in a somewhat similar context, even if they (the court) accepted the statements of the buyer alleging fraud, where the seller's statements "were sufficient to excite the suspicions of a reasonably prudent man," it was the "[buyer's] duty to take advantage of the opportunity and ascertain the true condition of the premises and, having failed to do so, they cannot now avail themselves of the alleged misrepresentations."

In *Hitachi*, the Court of Appeals said Hitachi was reasonable and justified in relying on Signet's "representations and omission" because: 1) Hitachi conducted a prudent investigation under the circumstances, and 2) Signet's concealment of certain facts prevented Hitachi from making further inquiries. However, it cannot similarly be said that Potocska was reasonable and justified in relying on the Exhibit C representations that "RWA has confirmed" certain clients would remain; that MOSs for them were attached; and that the White Defendants had "Initial[ed] to confirm ____" these facts. First, as discussed above, Potocska did not conduct a prudent investigation because: 1) he failed to request permission to speak with any of these clients; 2) he failed, at closing or thereafter, to require production of the MOSs referenced in Exhibit C-upon which he relies; and 3) he failed, at closing or thereafter, to require completion of the "Initial to confirm ____" block at the bottom of each page of Exhibit C. Second, there has been no evidence that the White Defendants concealed facts that prevented Potocska from making appropriate inquiries. Like the situation in *Poe*, the absence of the MOSs, and the failure to have each page initialed, should have "excite[d] the suspicions of a reasonably prudent man," and it was therefore the duty of Potocska to "take advantage of the opportunity and ascertain the true condition of

the premises." *Id.* Having failed to do so, Potocska "cannot now avail himself of the alleged misrepresentations." *Id.*

While these facts most closely parallel *Poe*, they are also similar to the situation described by the Virginia Supreme Court in *Harris*. *Harris*, 203 Va. at 767, 127 S.E.2d 65. As the *Harris* Court said, "[t]he common law affords to everyone reasonable protection against fraud in dealing, but does not go to the romantic length of giving indemnity against the consequences of ... a careless indifference to the ordinary and accessible means of information." *Id.* at 771, 127 S.E.2d 65. Like the situation in *Poe*, Potocska had enough information to excite his suspicions, and he was therefore under a duty to ascertain the true condition for himself. Under such circumstances, the Potocska Claimants are left where they have been placed by Potocska's imprudent confidence.

Accordingly, because the Potocska Claimants have not brought forth sufficient facts to meet the "clear and convincing" evidence standard of proof required to support their allegation that reliance was "reasonable" and sufficient to prove fraud under Virginia law, there is no genuine issue of material fact on this fraud claim, and the White Defendants' Motion for Summary Judgment on this issue is **GRANTED.**

4. Client List Complete and Accurate

This claim is a catchall allegation that is a combination of all the issues related to WIPs, MOSs, and Exhibit C. At the hearing, counsel for the Potocska Claimants was asked by the Court what this claim entailed. Counsel stated that this issue is related to the issues of the MOSs, WIPs, and Exhibit C. (Transcript at p. 73.) As all of these issues have been specifically addressed within this Opinion and Order, the Court will not revisit each discussion here.

#### 5. Eidem's 25% Ownership in Two Texas Clients

Eidem had a 25% ownership interest in two Texas clients, which was not disclosed to Potocska. The Potocska Claimants contend that this ownership interest was concealed to induce Potocska to purchase RW & A. They argue that § 2.20 of the APA required Eidem, White, and Gunbeyi to disclose Eidem's minority ownership in the two Texas companies. The Potocska Claimants allege that Eidem never intended to stay with RW & A and that she intended to take these clients when she left. They assert that this is established by the timing of her resignation and the timing of the cancellation of services by the Texas companies, which creates an inference that she did not intend to remain with RW & A and that she intended to take these clients with her. The Potocska Claimants also assert that Eidem's December 3, 2006 email response to White supports such an inference.

The White Defendants assert that Potocska has not suffered any damage as a result of Eidem's failure to declare her minority ownership in the two Texas companies. Moreover, they argue that § 2.20 of the APA required revealing ownership in any entities with which RW & A had a **material** business relationship. As the two Texas companies were small clients, their relationship was not material to RW & A, unlike Beach Trucks and Western Branch Properties, which generated significant annual revenues for RW & A. They assert that Eidem's minority ownership in these companies was noted in the client files for these companies, and thus, Potocska could have learned of Eidem's ownership interest if he had examined the client file during due diligence. Finally, they assert that there is no evidence to support the allegation that Eidem never intended to remain in the employ of RW & A and that she intended to take the Texas clients with her when she left.

Eidem did own a 25% interest in Ampersand Ventures, which owned a sandwich shop in Corpus Christi, and Vertigo Ventures, which owned the real estate on which the sandwich shop was located. Both of these companies were clients of RW & A, with annual billings of approximately $4,000.00. Eidem, who did not directly take part in the negotiations for the sale of RW & A, did not disclose this information. Neither White, nor Gunbeyi, who were both aware of Eidem's ownership interest, disclosed this information to Potocska. Approximately a month after closing the sale of RW & A, Eidem resigned from RW & A. Subsequently, the companies in Corpus Christi terminated their relationship with RW & A.

The Potocska Claimants have not shown that they suffered any damage from the failure of the White Defendants to disclose Eidem's minority ownership interest in the two Texas companies, unless the damage is the loss of business subsequent to Eidem's resignation. However, loss of future business is a wholly different issue. The loss of future business issue relates to breach of the non-compete clause of the APA. Nevertheless, the White Defendants have submitted the affidavits of the owners of the Texas companies, stating that Eidem did not entice them away or solicit them in any way. They aver that they simply changed firms when they learned that Eidem was no longer with RW & A.

The Potocska Claimants rely on an email thread between White and Eidem to assert that the White Defendants hid this information because it would result in a dollar for dollar reduction in the price. On December 3, 2006, White (by email) asked Eidem to read the APA. Eidem emailed White, asking why Section 4.6 of the APA (the non-compete section) included the

Texas companies, which she asserted were clients because of their personal relationship with her. In his email response, White reminded Eidem that the clients were clients of RW & A and not her personal clients. White also advised Eidem that if these clients were excluded from the non-compete section, it would result in a dollar for dollar reduction in the price. Eidem replied that she only asked because if she ever left RW & A, she would like "to be able to work with these clients if the opportunity arises." (The Potocska Claimants' Ex. 6.)

White and Eidem were discussing Section 4.6 dealing with the non-compete clause, not Section 2.20 dealing with affiliate transactions. Furthermore, nothing in the record suggests that her minority ownership, if revealed, would have led to a dollar for dollar reduction. For example, there is nothing in the record to suggest that White's ownership interest in Beach Trucks and Western Branch Properties resulted in a dollar for dollar reduction in the price. All that was required was that White sign three-year MOSs for these companies. But, as a minority owner, Eidem would not have had the authority to dictate signature of such MOSs. Thus, the lack of knowledge of Eidem's ownership interest did not in and of itself cause Potocska damage.

■ The Potocska Claimants assert that it is clear from the email thread with White, an email between Eidem and her current employer shortly before her resignation, her resignation only a month after the sale of RW & A to Potocska, and the subsequent loss of the Texas clients, that Eidem had no intention of staying with RW & A after closing and had, at the time she signed the APA, no intention of honoring the non-compete agreement. If a per-

son makes a promise that, **at the time made,** he does not intend to perform, that promise is a misrepresentation of present fact and may form the basis of a claim of actual fraud. *Richmond Metro. Auth.*, 256 Va. at 559–60, 507 S.E.2d 344. However, fraud requires clear and convincing evidence. *Bank of Montreal*, 193 F.3d at 826.

The email thread with White shows at most that Eidem was thinking about the future and that she wished to continue servicing these clients. Reading it in the context of the Potocska Claimants' argument, the email between Eidem and Darrell, at the accounting firm where she later went to work, shows that she had possibly talked with him about coming to work for that firm.[19] Assuming that Eidem's "decision" relates to leaving RW & A, the email also indicates that she had not yet made such a decision. Thus, it does not support the contention that she had decided **prior to signing the APA** that she would not stay with RW & A.

■ Finally, and perhaps more importantly, Eidem's ownership interest was reflected in the two clients' files, which Potocska could have accessed. Thus, under Virginia law, Potocska is charged with this knowledge and cannot claim to have relied on any failure to disclose or representations of the White Defendants. *Harris*, 203 Va. at 767, 127 S.E.2d 65. Therefore, with no genuine issue of material fact existing on this claim, the White Defendants' Motion for Summary Judgment is **GRANTED.**

### 6. Good Professional Relationship with Clients

■ In Section 2.12 of the APA, the White Defendants represented that RW & A's "relationship with its clients on the

---

19. The email message from Eidem to Darrell states in its entirety: "Hi Darrell, Did you guys have a nice trip? I assume you got back ok. I guess I need to make a decision & come in. Has anything changed since we talked last?" Defs'. Ex. 7.

Client List and other parties are good professional working relationships." The Potocska Claimants assert that RW & A did not have a good professional relationship with clients. A number of clients were unhappy with the service they received prior to the sale. The Potocska Claimants contend that big clients received the bulk of attention; small clients were not given immediate attention, and sometimes the work for them was not completed in a timely fashion. They also assert that, contrary to the representation in Section 2.23 of the APA, RW & A sometimes had to sue clients to get paid for their services, and that the White Defendants misrepresented that they had never been involved in litigation of any sort.

The White Defendants assert that they did have a good professional relationship with their clients and that, out of the hundreds of clients serviced by RW & A, the Potocska Claimants are only able to point to a handful of clients who were dissatisfied with the service provided by RW & A prior to the sale of the firm to Potocska. The White Defendants point to the notations in Exhibit C stating that RW & A was behind on some client work and discounts or write-offs would be given. Thus, they assert that Potocska was aware before closing that there were some dissatisfied clients. They also contend that Exhibit A to the APA shows that two clients had to be sued for payment, and thus Potocska knew that sometimes clients had to be sued for payment.

The record makes it clear that, prior to closing, Potocska was aware that RW & A sometimes had to sue clients. Page 6 of Exhibit A attached to the APA shows two clients who had to be sued for payment of fees. A judgment had been awarded in one case and a warrant in debt had been filed against the other client. Therefore, Potocska could not have reasonably relied on any belief that RW & A never had to

sue clients to receive payment of fees due. In addition, Exhibit C shows RW & A was behind on work for several clients and that write offs or discounts would be offered. Therefore, Potocska could not have believed that there was 100% satisfaction. Moreover, the APA does not define Good Professional Relationship as every client being happy and willing to pay their fees. The Potocska Claimants have not shown that there was a systemic problem of poor and unprofessional treatment of the clients. The most they have established is that a few small clients were displeased with the service that they received.

Accordingly, with no genuine issue of material fact on this claim, the White Defendants' Motion for Summary Judgment is **GRANTED.**

### 7. Beach Truck and Western Branch Properties

■ Just prior to closing, Potocska required White to sign three-year MOS agreements for Beach Trucks and Western Branch Properties, companies in which White owned 50% and 51% interests, respectively. This is also required in § 1.12 of the APA. The Potocska Claimants contend that White never intended to continue using RW & A for these companies for the three-year period and that he only agreed to continue using RW & A to induce Potocska to purchase RW & A.

The White Defendants assert that there is no evidence in the record to support the Potocska Claimants' allegation that White never had any intention of honoring the MOSs for Beach Trucks and Western Branch Properties. They assert that these companies did use RW & A until after Potocska ceased paying on the Note.

White, in an email, makes it clear that he considered this requirement to be reprehensible. Several months after closing, White sold his interest in Western Branch Properties to J. Faircloth. J. Faircloth then cancelled the property management

portion of the contracted work that was to be performed by RW & A. Potocska ceased paying on the Note beginning June 1, 2007. Thereafter, White directed that Beach Trucks cease paying RW & A. In July 2007, Western Branch Properties cancelled accounting and tax services with RW & A.

In an effort to show White's intention at the time of closing, the Potocska Claimants rely on White's deposition testimony, which they characterize as saying that he had no intention of keeping the commitment. However, a review of the testimony reveals that White was saying that when he made the commitment, he had no intention of simply giving ten days notice which would allow him to cancel services. The Potocska Claimants also rely on the email where White told Potocska's attorney that he despised the tactic of renegotiating at such a late stage and stating that extending terms for these clients was never discussed. However, White still signed MOSs for these companies.

If a person makes a promise that, at the time made, he does not intend to perform, that promise is a misrepresentation of present fact and may form the basis of a claim of actual fraud. *Richmond Metro. Auth.*, 256 Va. at 559–60, 507 S.E.2d 344. However, evidence of a present intention must be "clear, cogent, and convincing." *Patrick v. Summers*, 235 Va. 452, 454, 369 S.E.2d 162 (1988).

There is simply no evidence to support the contention that White had a present intention, at the time he signed the APA, that Beach Trucks and Western Branch Properties would not continue to use RW & A. There is evidence that White was quite annoyed by the requirement that he sign three-year MOSs, but he signed them. These companies did use RW & A after the closing. White sold his interest in Western Branch Properties to J. Faircloth. It is J. Faircloth who terminated RW & A's services. White caused Beach Trucks to cease paying RW & A in retaliation for Potocska's failure to pay on the Note. At most, the Potocska Claimants have established a possible breach of contract. They have not established a genuine issue of material fact as to whether Beach Trucks and Western Branch Properties would have ceased using RW & A even if the dispute over the Note had not arisen. Furthermore, they have not established a genuine issue of material fact on their claim of actual fraud, and there is no claim of constructive fraud under the "present intention" theory of fraud. *Supervalu*, 276 Va. at 368, 666 S.E.2d 335. Accordingly, the White Defendants' Motion for Summary Judgment on this claim is **GRANTED.**

### 8. Computer Issues

The Potocska Claimants also contend that Gunbeyi misled Potocska about the condition of the computer system used by RW & A. They allege that Gunbeyi told Potocska that the computer system was maintained by Laratta and that only 25% of the system was being used. The Potocska Claimants assert that two of the computer terminals were dummy terminals, and that sometime after closing, two servers failed. They further allege that these failures resulted from inadequate maintenance of the computer system during White's tenure. In addition, the Potocska Claimants allege that Potocska had to install upgrades that the White Defendants failed to have installed. The Potocska Claimants also complain that Carol White & Associates' use of RW & A's computer server created instability in that it used space on the system.[20]

---

[20] Carol White & Associates subleased space in the same building as RW & A and paid RW & A to use their computer system.

The White Defendants assert that the computer system was working at the time of closing. They point to Exhibit B of the APA, item 149, which lists two dummy terminals. They also argue that there were monthly maintenance reports from Xcentric at RW & A which Potocska could have examined prior to closing and Potocska could have hired computer experts to examine the system prior to purchase, just as he did after closing. Moreover, they contend that there is no evidence that they were aware of any computer problems.

It is in fact true that the two dummy computer terminals were specifically mentioned in Exhibit B to the APA. Therefore, the Potocska Claimants have no claim on that issue.

The argument regarding the computer servers similarly fails. It is alleged that sometime after closing, two servers failed and, when someone tried to back up the entire system into a partition, the system crashed. It is claimed that these failures resulted from inadequate maintenance of the computer system. In addition, it is alleged that the Potocska Claimants had to install upgrades that the White Defendants should have installed for proper maintenance and functioning. The Potocska Claimants vaguely assert that Carol White & Associates' use of the RW & A computer server caused instability. However, they do not allege any actual damage stemming from the alleged instability. In addition, the $135 monthly fee charged for

Carol White & Associates' use of the computer server is noted in Exhibit C. In Gunbeyi's unrebutted affidavit, he states that he told Potocska that Carol White & Associates used the computer server. (Gunbeyi Aff. ¶ 32.) Finally, there is nothing in the record to suggest that Potocska was prevented from discontinuing Carol White & Associates' use of the computer server after closing.

At oral argument, the Court learned that the Potocska Claimants had not named an expert to address these issues at trial. The mere fact that servers failed and the system crashed months after closing does not alone establish fraud. Fraud would require problems to be present or predictable at the time the APA was signed. To support their claim, the Potocska Claimants have submitted only Potocska's opinion and Potocska's statement that he was told by a computer consultant that RW & A did not always install the recommended upgrades, however this statement is inadmissable hearsay. Fraud requires clear and convincing evidence, not mere personal opinion. The Potocska Claimants have failed to show that there exists a genuine issue of material fact to support even a breach of contract claim, much less a claim of fraud. Without expert testimony, the Potocska Claimants cannot establish that there were problems with the computer system for which the White Defendants are responsible.[21]

---

**21.** The Potocska Claimants assert that Gunbeyi represented that only 25% of the computer memory was being utilized. However, in July 2007, when someone tried to back up the entire system into a partition, the computer crashed. The Potocska Claimants assert that there was not enough room in the system to read the reboot disc. Thus, they claim that far more than 25% of the computer space must have been utilized. However, the Potocska Claimants have submitted evidence to the Court that Potocska had several programs installed after closing. Moreover, there is no doubt that new client files were added after closing. Thus, the Potocska Claimants's simple mathematical example does not establish anything. A computer expert would be required to testify as to how much space was utilized prior to closing. A computer expert would be required to testify about the condition of the system and whether any problems with the computer can be attributed to some failure on the part of the White Defendants.

Once again, the real hurdle for the Potocska Claimants is their due diligence—or lack thereof. The computer was maintained by Laratta as well as an outside IT firm, Xcentric. The monthly reports from Xcentric **were in the files of RW & A.** Thus, Potocska could have viewed these records. *Harris,* 203 Va. at 767, 127 S.E.2d 65. Potocska also could have hired an outside IT firm to evaluate the condition of the computer system prior to closing. Moreover, there is no evidence in the record to suggest that the White Defendants knew there would be problems with the computer. Accordingly, for all these reasons, there is no genuine issue of material fact, and the White Defendants' Motion for Summary Judgment on this claim is **GRANTED.**

### 9. RW & A Marketed as CPA Firm

The Potocska Claimants further contend that RW & A advertised itself as a CPA firm, despite the fact that it was a financial services firm.[22] They also complain that, at the time of purchase, RW & A was listed in the yellow pages under "Certified Public Accountants" as well as under "Tax Return Preparation," and "Consulting." They further detail three clients who reportedly terminated business with RW & A because they thought RW & A was a CPA firm prior to the sale to Potocska, and they did not want to abide by the rules imposed on a CPA firm, which Potocska required after the sale occurred.

The White Defendants assert that as White is a CPA, he may use that designation. They contend that RW & A never marketed the firm as a CPA firm. They assert that the existence of a couple of clients who misunderstood the difference between a CPA firm and a financial services firm does not establish fraud.

There is no evidence that the White Defendants misled Potocska about the nature of RW & A. There is nothing in the record to suggest that Potocska was under the impression that RW & A was a CPA firm. Moreover, as part of his due diligence, Potocska could have easily determined that RW & A was listed under "Certified Public Accountants" by looking in the telephone book. There is simply no evidence of fraud on the part of the White Defendants. The most that the Potocska Claimants have established is that a few clients were under a mistaken impression that RW & A was a CPA firm, but such pre-sale marketing efforts to third-parties do not constitute fraud.

Accordingly, there being no genuine issue of material fact, the White Defendants' Motion for Summary Judgment on this claim is **GRANTED.**

### 10. Questioned Accounts

The Potocska Claimants assert that many of the "Questioned Accounts" in Schedule 8.5 were invalid and did not continue to be clients of RW & A. Although the APA provides for a setoff if these accounts are not valid, White denied Potocska's setoff request. Therefore, they contend that White never intended to allow setoff for the Questioned Accounts.

The White Defendants contend that the Questioned Accounts in Schedule 8.5 cannot be the basis of allegations of fraud, as Potocska himself questioned these accounts; therefore, he cannot claim to have relied on any representations to the contrary. Moreover, § 8.5 of the APA provides a remedy, in the form of setoff against the Note, for any of these accounts that are not valid. Thus, they contend that the Potocska Claimants' cause of ac-

---

**22.** CPA firms must comply with CPA licensing rules and the Ethics Standards that govern the operation of a CPA firm. Financial services firms are not bound by these rules and standards. Financial services firms cannot conduct audits and certain other functions that CPA firms are able to perform.

tion is breach of contract, not fraud. They also deny the assertion that White never intended to allow setoff for these clients if they were found to be invalid, and they claim that there is no evidence to support the Potocska Claimants' assertion. Finally, in his Amended Complaint, White says he is willing to give the Potocska Claimants the benefit of the doubt and accept a setoff of $5,820.00 of the $13,390.00 claimed.

Potocska himself questioned these accounts, which is why he had them listed in Schedule 8.5 as "Questioned Accounts." Moreover, the APA provides a setoff remedy for any of these accounts that are not valid as long as the request was made by May 31, 2007. The Potocska Claimants assert that White denied the request for setoff and that he never had any intention of allowing a setoff. However, that would not preclude the Potocska Claimants from bringing suit seeking setoff. The denial of setoff cannot become fraud unless White did not intend, at the time he signed the APA, to allow any setoff. As previously discussed, if a person makes a promise that, at the time made, he does not intend to perform, that promise is a misrepresentation of present fact and may form the basis of a claim of actual fraud. *Richmond Metro. Auth.*, 256 Va. at 559–60, 507 S.E.2d 344. However, there is no such evidence other than the Potocska Claimants' bald assertion that White never intended to allow set-off.

■ The Potocska Claimants have established at most a breach of contract. A breach after the fact is not sufficient without more to establish a present state of mind. There are no genuine issues of material fact that would support a claim that White engaged in actual fraud, and there can be no action for constructive fraud under the "present intention" theory of fraud. *Richmond Metro. Auth.*, 256 Va. at 553, 507 S.E.2d 344. Accordingly, the

White Defendants' Motion for Summary Judgment on this claim is **GRANTED.**

### 11. Statements Regarding Quality of Business

■ The Potocska Claimants have made several references in their pleadings to statements made at various times by the White Defendants regarding the quality of RW & A employees, the quality of RW & A marketing, the likelihood of continued good business performance, and similar statements. The Virginia Supreme Court has repeatedly held that "[f]raud must relate to a present or a pre-existing fact, and cannot ordinarily be predicated on unfulfilled promises or statements as to future events." *Lumbermen's Underwriting Alliance v. Dave's Cabinet, Inc.*, 258 Va. 377, 382, 520 S.E.2d 362 (1999) (quoting *Soble v. Herman*, 175 Va. 489, 500, 9 S.E.2d 459 (1940)). The Court has also repeatedly said that "commendatory statements, trade talk, or puffing, do not constitute fraud because statements of this nature are generally regarded as mere expressions of opinion which cannot rightfully be relied upon, at least where the parties deal on equal terms." *Lambert v. Downtown Garage, Inc.*, 262 Va. 707, 713, 553 S.E.2d 714 (2001) (quoting *Tate v. Colony House Builders*, 257 Va. 78, 84, 508 S.E.2d 597 (1999)). Therefore, statements such as those that the Potocska Claimants attribute to the White Defendants cannot support fraud allegations. There being no genuine issue of material fact with respect to such statements, the White Defendants' motion for summary judgment on these statements is **GRANTED.**

### D. Conspiracy to Commit Fraud

The Potocska Claimants have also raised a claim of conspiracy to commit fraud. They assert that as shareholders, White, Gunbeyi, and Eidem had their own personal interest in the sale of RW & A, and that

their interests differed from that of the corporate entity of RW & A. Therefore, they contend that this case represents an exception to the Virginia law stating that a corporate entity acting solely through its agents cannot conspire.

The White Defendants assert that Virginia has never recognized a "personal stake" exception to the general rule that agents acting on behalf of a corporate entity cannot conspire.

■ A conspiracy requires that two or more persons act together. *Charles E. Brauer Co., Inc. v. NationsBank of Virginia*, 251 Va. 28, 36, 466 S.E.2d 382 (1996). A corporate entity, acting through its agents, "cannot conspire with itself, so a conspiracy cannot exist if Defendants are agents of the same principle acting within the scope of agency." *Phoenix Renovation Corp. v. Rodriguez*, 461 F.Supp.2d 411, 429 (E.D.Va.2006) (citing *Fox v. Deese*, 234 Va. 412, 428, 362 S.E.2d 699 (1987)).

■ The White Defendants were all owners of RW & A. Thus, under Virginia law, they cannot have conspired with each other. The Potocska Claimants assert that, as shareholders, the White Defendants had their own personal interest in the sale of RW & A, and that their interests differed from that of the corporate entity of RW & A. However, "Virginia has not recognized the so-called 'personal stake' exception to [the] general rule when the conspiring agent has an independent personal stake in achieving the conspiracy's illegal objective." *Id.; Little Professor Book Co. v. Reston N. Point Village Ltd. Pshp.*, 41 Va. Cir. 73, 79 (Fairfax County 1996). Accordingly, the White Defendants' Motion for Summary Judgment on this claim is **GRANTED.**

### E. Breach of Contract

As the Court discussed above in determining which law applies to the tort claims, Section 9.11 of the APA stipulates that disputes under the contract are governed by the law of Virginia. This action was brought in diversity. Thus, the choice of law rules of Virginia apply. *Hitachi Credit America Corp.*, 166 F.3d at 624 (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). Virginia law gives full effect to contractual choice of law clauses. *Id.* Therefore, the Court will apply Virginia law to the breach of contract claims.

■ The Potocska Claimants allege that the White Defendants violated various provisions of the APA. In their opposition to the White Defendants' Motion for Summary Judgement, the Potocska Claimants simply assert that they have stated a claim for breach of contract. They do not present any facts or argument to support the claims of breach of contract. The White Defendants contend that the Potocska Claimants have failed to rebut their Motion for Summary Judgment. The White Defendants' argument is well-taken. It is not the responsibility of the Court to cull the record seeking to find items that may rebut the White Defendants' Motion for Summary Judgment. Accordingly, finding that the Potocska Claimants have failed to rebut the summary judgment motion of the White Defendants, the motion is granted. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586–87, 106 S.Ct. 1348. While the claims for breach of contract could be dismissed on this ground alone, because the Court reviewed much of this information while considering the fraud claims, a brief contract analysis follows based on the Potocska Claimants' fraud arguments.

1. The White Defendants failed to fully convey all client and vendor files

The Potocska Claimants assert that the White Defendants "failed to fully convey

all client and vendor files in that all client and vendor files did not exist." (Counterclaim ¶ 45.) The Potocska Claimants never identified the nature of this claim, and have presented no evidence to support this claim. For the first time at oral argument, counsel suggested this claim has to do with Potocska being unable to access all files for several months. However, the briefs do not address this at all. This claim was not pursued at all by the Potocska Claimants during briefing, effectively preventing the opposing parties from fully responding and, thus this claim is dismissed for want of prosecution as no genuine issue of material fact exists.

### 2. Computer Issues

The Potocska Claimants assert that in the APA the White Defendants represented that the computer system was in good working order. They assert that two of the terminals were dummy terminals. However, the APA specifically mentions these dummy terminals.

The Potocska Claimants also allege that, sometime after closing, two servers failed and the system crashed when someone attempted to back up the entire system into a partition. The Potocska Claimants assert that these failures resulted from inadequate maintenance of the computer system. In addition, they allege that they had to install upgrades that the White Defendants failed to have installed.

The Potocska Claimants have not submitted any admissible evidence that the computer problems that occurred months after the closing were the fault of the White Defendants. Moreover, they have not designated an expert to testify regarding this issue. Without expert testimony, there is no way on these facts and contentions for a trier of fact to determine whether a breach occurred, and therefore no genuine issue of material fact exits.

### 3. Certain files are password protected

There are files on the RW & A computer system that are password protected, and Potocska cannot access them. The White Defendants claim that these files are personal files of former employees and are not part of the assets purchased by Potocska. The Potocska Claimants also assert that they are on the RW & A computer system and utilizing space on the computer system, which cannot be used. This claim may establish a breach of contract. However, the Potocska Claimants have not shown that they suffered any monetary damage as a result of these files being on the RW & A computer system. For damage to be material under the APA, the aggregate damage must be in excess of $2,000.00. (Section 8.2 of the APA.) As this is the only potentially viable claim for breach of contract, the Potocska Claimants had to establish damages on this claim in excess of $2,000.00. The Potocska Claimants have failed to establish aggregate damages on this claim in excess of $2,000.00 and therefore no genuine issue of material fact exists.

### 4. The White Defendants have failed to provide common space

The Potocska Claimants allege that the White Defendants have failed to provide common space as required by § 1.9 of the APA. They allege that common space in the building was being utilized by Carpe Diem and thus could not be used for confidential discussions with clients. However, White's unrebutted affidavit states that Potocska took over all of the space utilized by RW & A. (White Aff. ¶ 27.)

Common space is exactly that—space for use by tenants that is shared by all. It is unreasonable to assume that common space will be available for confidential discussions with clients. Accordingly, there is no evidence that the White Defendants

breached the contract on this point, and there is no genuine issue of material fact.

### 5. Gunbeyi violated paragraph 4.6 of the APA

White, Gunbeyi, and Eidem were required to sign non-compete agreements that included not enticing clients away from RW & A wherever located and not to compete within a seventy-five mile radius. The same requirement is found in § 4.6 of the APA. The Potocska Claimants allege that Gunbeyi affiliated himself with entities in competition with Potocska P.C.

Gunbeyi joined a job placement firm, Career Services, that had been a client of RW & A. The Potocska Claimants allege that Gunbeyi performs the same services for Career Services that he performed for them when he worked at RW & A. However, Gunbeyi's unrebutted affidavit states that the services that he provided to Career Services while employed with RW & A are now being provided by Goodman & Company. (Gunbeyi Aff. ¶ 41.) Defendants have failed to provide any evidence, other than Potocska's opinion, to support the claim that Gunbeyi is in competition with RW & A. Accordingly, there is no genuine issue of material fact on this issue.

### 6. Eidem enticed clients away in violation of § 4.6

The Potocska Claimants contend that Eidem enticed clients away in violation of § 4.6 of the APA.[23] They assert that Eidem told the Texas clients that she was leaving RW & A before advising Potocska of her resignation, thus preventing Potocska from establishing another office in Texas to service these clients prior to their learning that she would no longer be working at RW & A.

The White Defendants contend that the affidavits of the owners of the Texas companies that left RW & A to follow Eidem show that Eidem did not entice these clients away. The White Defendants assert that the Potocska Claimants' inference theory is insufficient on summary judgment to rebut these affidavits.

After twice being advised that her insubordination could be grounds for termination, Eidem resigned from RW & A. Subsequently, the Texas clients terminated their association with RW & A, and became clients of the firm that Eidem joined after leaving RW & A. The White Defendants provided affidavits of these clients stating that Eidem did not entice them away. Rather, when she told them she was no longer working for RW & A, or they learned from other people that she was no longer working for RW & A, they chose to go with the firm where she was then working.

The Potocska Claimants have failed to provide any evidence to support this claim. Rather, they seek to create an inference, based on the timing of the clients' cancellation so shortly after Eidem's resignation from RW & A. In order to successfully defeat a motion for summary judgment, the nonmoving party must rely on more than conclusory allegations, "mere speculation," the "building of one inference upon another," the "mere existence of a scintilla of evidence," or the appearance of "some metaphysical doubt" concerning a material fact. *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. The Potocska Claimants have failed in this effort.

The Potocska Claimants assert that Eidem told clients that she was leaving RW & A before she told Potocska, which prevented Potocska from establishing a satellite office in Texas before these clients learned that Eidem was leaving RW & A.

---

**23.** For purposes of clarity, there is no claim that Eidem is in competition with Potocska because Eidem and the clients she services are in Texas, and the non-compete provision is limited to a seventy-five mile radius.

Eidem's affidavit states that she told the Texas clients **after** she told Potocska. (Eidem Aff. ¶ 20.) Eidem further states she encouraged the Texas clients to stay with RW & A. (*Id.* ¶ 29.) The affidavits of the Texas clients show that at least one client, Chris Hamilton, owner of KJM Commercial in Corpus Christi, Texas, found out after Eidem left, and in fact it was his in-house comptroller who informed him that Eidem had left RW & A. (Hamilton Aff. ¶ 3.)

The Potocska Claimants seek to create an inference that Eidem told the Texas clients before she told Potocska based on how quickly these entities were able to become customers of the firm that Eidem joined. However, Eidem explains in her affidavit that these entities already had a working relationship with the firm she joined, and that they used RW & A for some services because Eidem was a personal friend. (Eidem Aff. ¶ 26–27.) Again, the Potocska Claimants seek to rely on inference in the face of affidavits, and they have therefore failed to identify any genuine issue of material fact.

Accordingly, for all the reasons stated above, the White Defendants' Motion for Summary Judgment on the breach of contract claims is **GRANTED.**

### F. Reformation of Contract

The Potocska Claimants seek to have the contract reformed. Where a contract contains no ambiguities, parol evidence cannot normally be used to show that the actual intentions of the parties were different than the writing. *Dillard v. Jefferies,* 118 Va. 81, 85, 86 S.E. 844 (1915). A recognized exception is when there is a mutual mistake, and in such circumstances, a court may reform the contract to reflect the intentions of the parties.

*Boone v. Califano,* 459 F.Supp. 636, 638 (E.D.Va.1978)(citing *Gibbs v. Price,* 207 Va. 448, 150 S.E.2d 551 (1966)).

Where a mistake is unilateral, **and** accompanied by fraud on the part of the other party, reformation of a contract may be appropriate. *Ward v. Ward,* 239 Va. 1, 5, 387 S.E.2d 460 (1990). As the Potocska Claimants assert that Potocska made a unilateral mistake, the only way this claim could have survived is if any fraud claims survived.[24] However, the Court has granted summary judgment to the White Defendants on all the fraud claims. Accordingly, the claim for reformation of the contract cannot stand. Therefore, the Court **GRANTS** the White Defendants' Motion for Summary Judgment on this claim.

### G. The Note

White has moved for summary judgment on the Complaint as amended. The Potocska Defendants have not made a claim for setoff, which is an affirmative defense that must be pled. Fed.R.Civ.P. 8(c)(1). Nevertheless, White has allowed for some setoff in the Complaint as amended. As all of the Potocska Defendants' defenses have been dismissed, summary judgment on the Note is **GRANTED.**

### III. Motion to Bifurcate

On August 28, 2008, White moved to bifurcate the trial of his request for attorneys' fees from the case in chief. The Motion to Bifurcate Trial of Plaintiff's Request for Attorneys' Fees from Case in Chief is unopposed. However, White's Motion to Bifurcate Trial of Plaintiff's Request for Attorneys' Fees from Case in Chief is **MOOT.** The only issue left to try

---

**24.** In their Response in Opposition to Counter Defendants' Motion for Summary Judgment, the Potocska Claimants claim that "[b]ecause of the fraudulent misrepresentations perpetu-ated by White, Gunbeyi, and Eidem, and purposely made, counterclaimants were unilaterally mistaken...." (Resp. in Opp'n. to Mot. Summ. J. at p. 25).

is the issue of attorneys' fees. Trial is currently set for December 16, 2008, at 10:00 a.m., and the issue of attorneys' fees will be tried at that time.

## IV. Conclusion

For the aforementioned reasons, the White Defendants' Motion for Summary Judgment on the Counterclaim is **GRANTED**. White's Motion for Summary Judgment on the Complaint as amended is **GRANTED**. White's Motion to Bifurcate Trial of Plaintiff's Request for Attorneys' Fees from Case in Chief is **MOOT**. Trial on the issue of attorneys' fees is set for December 16, 2008, at 10:00 a.m., in the Norfolk Division, Courtroom 3.

**IT IS SO ORDERED.**